# Exhibit A

**In the Matter Of:**

KING vs. EQUISTAR CHEMICALS

4:12-cv-00341

**MATTHEW KING**

*October 03, 2012*



800.211.DEPO (3376)
EsquireSolutions.com

1    IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
2                 HOUSTON DIVISION

3    MATTHEW KING                    )
                                     )
4    vs.                             )CASE NO. 4:12-cv-00341
                                     )
5    EQUISTAR CHEMICALS, L.P.,       )
     LYONDELLBASELL INDUSTRIES,      )
6    N.V., a/k/a LYONDELBASSEL,      )
     BENJAMIN FRANKLIN WITHERS,      )
7    III, M.D., AND TAKE CARE        )
     HEALTH SYSTEMS                  )
8

9              ORAL VIDEOTAPED DEPOSITION

10                    MATTHEW KING

11                  October 3, 2012

12

13        ORAL VIDEOTAPED DEPOSITION OF MATTHEW KING,

14   produced as a witness at the instance of the

15   Defendant and duly sworn, was taken in the

16   above-styled and numbered cause on the 3rd day of

17   October, 2012, from 7:23 a.m. to 2:13 p.m., before

18   Shauna Foreman, Certified Shorthand Reporter in and

19   for the State of Texas, reported by computerized

20   stenotype machine at the offices of Peckham, PLLC,

21   800 Bering Drive, Suite 220, Houston, Texas, pursuant

22   to the Federal Rules of Civil Procedure and the

23   provisions stated on the record or attached hereto.

24

25



MATTHEW KING                                   October 03, 2012
KING vs. EQUISTAR CHEMICALS                                   2

```
 1                      APPEARANCES

 2

 3    FOR PLAINTIFF:

 4            CHARLES H. PECKHAM, ESQ.
              PECKHAM, PLLC
 5            800 Bering Drive
              Suite 220
 6            Houston, Texas  77057
              Telephone: 713-574-9044
 7            Fax:  713-493-2255
              E-mail: cpeckham@peckhampllc.com
 8

 9    FOR EQUISTAR:

10            MARLENE C. WILLIAMS, ESQ.
              ANITA BARKSDALE, ESQ.
11            JACKSON WALKER
              1401 McKinney
12            Suite 1900
              Houston, Texas  77010
13            Telephone: 713-752-4200
              Fax:  713-752-4221
14            E-mail: mcwilliams@jw.com

15    FOR TAKE CARE HEALTH SYSTEMS AND DR. WITHERS:

16            VICTORIA M. PHIPPS, ESQ.
              LITTLER MENDELSON
17            1301 McKinney
              Suite 1900
18            Houston, Texas  77010
              Telephone: 713-951-9400
19            Fax:  713-951-9212
              E-mail: vphipps@littler.com

20    ALSO PRESENT:

21            Damon Norris, Videographer
              Dr. Benjamin Withers
22            Keith Hopkins
              Barbara Dunlap
23

24

25
```



MATTHEW KING
KING vs. EQUISTAR CHEMICALS

October 03, 2012

3

```
 1                        INDEX

 2                                          PAGE

 3   MATTHEW KING

 4   Examination by Ms. Phipps                  5

 5   Examination by Ms. Williams              129

 6   Examination by Mr. Peckham               185

 7   Further Examination by Ms. Phipps        194

 8   Further Examinationn by Ms. Williams     196

 9   Further Examination by Mr. Peckham       197

10

11                      EXHIBITS

12   NO.      PAGE      DESCRIPTION

13   1        13        Certificates

14   2        23        Application for Employment - Mistras

15   3        23        Personal History Questionnaire - Mistras

16   4        37        Application for Employment - Frank Crum

17   5        39        Application for Employment - Summit

18                      Staffing

19   6        48        E-mails

20   7        53        Offer of Employment - Q Pro

21   8        55        Application for Employment - Administaff

22   9        60        Notes - Dr. Muniz

23   10       66        Application for Employment - Equistar

24   11       71        Employee FMLA Guide

25
```



MATTHEW KING
KING vs. EQUISTAR CHEMICALS
October 03, 2012
4

| 1 | | | EXHIBITS (cont.) |
|---|---|---|---|
| 2 | NO. | PAGE | DESCRIPTION |
| 3 | 12 | 72 | Request for Family or Medical Leave |
| 4 | 13 | 72 | Request for Family or Medical Leave |
| 5 | 14 | 76 | Return to Work Certificate |
| 6 | 15 | 76 | Medical Disposition |
| 7 | 16 | 78 | Medical Certification Form |
| 8 | 17 | 87 | Job Site Analysis |
| 9 | 18 | 95 | Recommended Restrictions |
| 10 | 19 | 113 | Explanation of Benefits Letter |
| 11 | 20 | 114 | Personal Profile - Met Life |
| 12 | 21 | 140 | Charge of Discrimination |
| 13 | 22 | 169 | Authorization Form/Verification of |
| 14 | | | Consent |
| 15 | 23 | 191 | E-mail 8/20/10 |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |



```
 1        A.   That's not -- okay.
 2        Q.   Did you ever do that for Marathon?
 3        A.   What I did was I separated out all the
 4   maintenance performed tasks or reports and set them aside
 5   for the maintenance department.
 6        Q.   Okay.  So, you don't keep track of maintenance on
 7   the equipment?
 8        A.   No, ma'am.
 9        Q.   Okay.  All right.  And then No. 4 says, "Field
10   visit using the associated P&ID to verify that the correct
11   piece of equipment is installed at the correct location
12   and tagged appropriately."
13             Do you -- is that something you do?
14        A.   Yes, ma'am.
15        Q.   Okay.  And then he gives another example.  He
16   says, "For relief valves, I take a picture of the name tag
17   and data plate and then compare that the information on
18   tag and data plate matches" -- and then he says -- "what
19   is documented in the equipment file."
20             So, he's just giving you an example there
21   of what he does, correct?
22        A.   Yes, ma'am.
23        Q.   All right.  Then No. 5 is "Print the pictures and
24   insert in the equipment file."
25             Do you do that?
```



Case 4:12-cv-00341   Document 44-2   Filed on 02/01/13 in TXSD   Page 8 of 60

MATTHEW KING
KING vs. EQUISTAR CHEMICALS
October 03, 2012
52

1    A.   What I do is I download the pictures into an

2    electronic form and I leave it into a database and then I

3    have another person put the pictures into the file for me.

4        Q.   All right.  Who does the -- do you have a

5    clerical person assisting you?

6        A.   Yes.

7        Q.   Okay.  And what's the name of the clerical

8    person?

9        A.   Anita.

10       Q.   What's Anita's --

11       A.   Don't ask me her last name.  I'm sorry.

12       Q.   So, does she assist you and the other

13   gentleman's -- I think you said his name was --

14       A.   Charles Hardy.

15       Q.   Charles, right.  Does she assist both you and

16   Charles?

17       A.   Yes.

18       Q.   Anything on here -- anything not on here that's

19   one of your more important tasks?

20              MR. PECKHAM:  Objection.  Form.  You can

21   answer.

22       A.   One of my more important tasks?

23       Q.   (By Ms. Phipps) Right.  I just want to make

24   sure that we have a list of your important tasks.

25              MR. PECKHAM:  Objection.  Form.  Sidebar.



MATTHEW KING
KING vs. EQUISTAR CHEMICALS

October 03, 2012
56

```
1        A.   (Witness reviews the document.)
2                 MR. PECKHAM:  Objection.  Form.  You can
3    answer.
4        A.   Yes, it is.
5        Q.   (By Ms. Phipps) Okay.  All right.  Now, I
6    want to talk to you a bit about your medical
7    condition just a bit.
8                 When did you first learn that you had
9    diabetes?
10       A.   Early 20s.
11       Q.   And how long have you been insulin dependent?
12       A.   God, to my best -- in the range of 10 years.
13       Q.   10 years?  Do you have to inject yourself with
14   insulin?
15       A.   Yes.
16       Q.   And I think you testified that you have dialysis
17   at the end of your workday three days a week?
18       A.   Yes.
19       Q.   All right.  And typically how long does the
20   dialysis procedure last?  How long does it take?
21       A.   Three hours, 15 minutes.
22       Q.   Are you currently in line for a kidney
23   transplant?
24       A.   Yes, ma'am.
25       Q.   Have you suffered any side effects from the
```



1     Q.  (By Ms. Phipps) Okay. I've handed you what's

2  been marked as Exhibit 10 to your deposition, which is --

3  appears to be your application to Equistar in 2003. When

4  you have a chance to look through it, when you get to the

5  last page, confirm that that's your signature and the

6  date.

7     A.  Yes, ma'am, it is my signature.

8     Q.  Okay. And you were hired to be a machinery

9  condition monitoring analyst; is that right?

10     A.  Yes, ma'am.

11     Q.  Is that the same thing as a vibration analyst?

12     A.  Yes, ma'am.

13     Q.  All right. So, that's the job you had at

14  Equistar the entire time you worked there?

15     A.  Yes, ma'am.

16     Q.  And before Equistar was Equistar, you worked at

17  Liondell, like, from 1998 to 2003?

18     A.  Equistar was first, then we became Lion --

19  LyondellBasell -- Liondell, and then LyondellBasell.

20     Q.  Okay. All right. So -- but when I refer to

21  Equistar, I'm referring to LyondellBasell, the whole group

22  of companies.

23     A.  Yes.

24     Q.  All right. And it's fair to say you never worked

25  for Take Care, one of the defendants in this case. You



1    A.  Prior to returning to work?

2    Q.  Yes, sir.

3    A.  Yes, I did.

4    Q.  You interacted with Dr. Withers prior to

5  March 2010?

6    A.  I can't remember the exact date that I talked to

7  him, but we talked one afternoon.

8    Q.  Was this in regard to your returning to work?

9    A.  Yes.

10   Q.  Okay.  So, I'm not talking about any incident

11  related to your return to work in 2010.  Before -- before

12  this whole incident arose where you wanted to -- where you

13  had to leave work on FMLA leave for a few weeks and then

14  tried to return in 2010 -- I understand that you and

15  Dr. Withers interacted then.  But prior to that did you go

16  see Dr. Withers because you had a cold or --

17   A.  Oh, no.  No, no.

18   Q.  Okay.  Did Mr. Withers ever tell you that he was

19  your supervisor?

20   A.  No.

21   Q.  At the medical facility -- what plant did you

22  work at for Equistar?

23   A.  BCO.

24   Q.  BCO?

25   A.  Yes, ma'am.



```
 1        Q.  -- October 26, '09.  Do you see that?
 2        A.  Yes, ma'am.
 3        Q.  Yes?  Okay.  And then the return to work date
 4   says 10/28/309.  Does that say that on your --
 5        A.  No, ma'am.  It says return to work date pending.
 6        Q.  Okay.
 7             MR. PECKHAM:  Do we have them swapped?
 8        A.  No, 13 --
 9             MR. PECKHAM:  12 has the 10/28 date and 13
10   has pending.
11        Q.  (By Ms. Phipps) Okay.  So, we're looking at
12   12.
13        A.  I see -- yes, ma'am.
14        Q.  All right.  And that is your signature in the
15   lower left corner?
16        A.  Yes, ma'am.
17        Q.  And it's actually dated 10/28/09.  All right.
18   Now, as I understood it, you did take time off in October
19   related to your renal failure; is that right?
20        A.  We -- what happened -- what happened here, I
21   believe, is when I filled out my -- my FMLA like this,
22   that I can remember, is Kimberly and I filled it out
23   early.
24        Q.  Kimberly Stubbs?
25        A.  Yes.
```



1    Q.   She was helping you fill out the paperwork?

2    A.   Yes, ma'am.

3    Q.   Okay.  All right.  And you filled -- and what was

4    this particular leave for?

5    A.   Every -- she said -- Kimberly and I -- what she

6    said, we would just fill it out early for the -- for the

7    renal stuff.

8    Q.   Okay.  So, you went to see Kimberly at some

9    point?

10    A.   Yes, ma'am.

11    Q.   And you told her you needed to be out for

12    surgery?

13    A.   I told Kimberly I was -- I filled it out early

14    because I was going in for renal failure.

15    Q.   Was this when they were going to put the fistula

16    in?

17    A.   This probably was when they were going to put

18    the -- no.  10/26/09.

19    Q.   I'm going to hand you another --

20            MR. PECKHAM:  Wait a second.  I think he's

21    trying to think his way through the dates.

22    A.   10/26/09.  I know we filled out -- the family

23    leave request out early.  I know we did that because she

24    said, "Well, why wait?  Let's do it now," and that's why

25    she filled it out and that's why I signed it.  Now,



1  because -- this wasn't for the fistula because I got my

2  fistula -- that was after the -- after the fact.  I mean,

3  that was, you know -- I can't -- I don't know the exact

4  date when it -- I had my fistula put in.

5       Q.  (By Ms. Phipps) Okay.

6       A.  I mean, but that was -- that was after the Family

7  Leave Act.

8       Q.  All right.  Okay.  Let me go back.

9       A.  I mean, you're --

10      Q.  Let me -- I'm going to do it this way.  You've

11  been handed what's been marked as Exhibit 14 to your

12  deposition, which is a certificate to return to work.

13  It's from Dr. Khan.

14            Do you remember Dr. Khan?

15      A.  Yes.

16      Q.  And he was treating you for renal failure?

17      A.  Yes, ma'am.

18      Q.  And he says that you were under his care from

19  October 17th to October 21st, '09.

20            Do you see that?

21      A.  Yes, ma'am.

22      Q.  All right.  So, you were out of work for that

23  period of time; is that right?

24      A.  Yes, ma'am.

25      Q.  All right.  And he says you were able to return



1    to work on 10/28/09.

2                    Do you see that?

3                    (Exhibit 14 marked)

4        A.   Return to work on 10/28 of '09, yes.

5        Q.   (By Ms. Phipps) Do you remember if you took FMLA

6    leave for this period of time you were off from

7    October 17th to October 21st?

8        A.   I'm sorry.  I don't remember.

9        Q.   Okay.  Exhibit 15 is a medical disposition form

10   which is dated October 28th of '09 which indicates you

11   can return to work without restrictions signed by Kimberly

12   Stubbs.

13                   Do you see that?

14       A.   Yes.

15       Q.   Does this refresh your recollection at all as to

16   your being out on family medical leave in October of '09?

17                   (Exhibit 15 marked)

18       A.   No.  I'm sorry.  I cannot remember the dates.

19       Q.   (By Ms. Phipps) Okay.  Is it fair to say that

20   Kimberly Stubbs was helpful to you in applying for -- for

21   family medical leave?

22                   MR. PECKHAM:  Objection.  Form.  Go ahead.

23       A.   Yes.

24                   MR. PECKHAM:  I'm sorry.  What was your

25   answer?



1    A.  Yes.

2         MR. PECKHAM:  Thank you.

3    Q.  (By Ms. Phipps) When you -- was Kimberly the

4  only person you told that you needed to take family

5  leave, or did you also tell Keith Hopkins?

6    A.  My main contact was Kimberly on Family Leave Act.

7  We filled out all the paperwork together.

8    Q.  Did you tell your supervisor that you were going

9  to have to be gone for a few weeks for some kind of

10  medical procedure?

11    A.  I would have to tell my supervisor any time I was

12  leaving, ma'am.

13    Q.  Okay.  All right.  But sitting here today, you

14  don't actually recall that conversation.  It was just your

15  general practice to do that?

16    A.  Yes, ma'am.

17    Q.  Did anyone at Equistar say anything negative to

18  you about taking family medical leave?

19    A.  No, ma'am.

20    Q.  Did anyone at Take Care say anything negative to

21  you about taking family medical leave?

22         MR. PECKHAM:  I'm just going to object to

23  time frame.

24    Q.  (By Ms. Phipps) Well, he said he only took

25  it once.  So, I'm going to say during the entire time



1   you worked at Equistar, did anyone at Take Care say

2   anything to you about taking family medical leave?

3        A.   As far as I can remember, no.

4        Q.   Okay.  The entire time you worked at Equistar,

5   did anyone at Equistar say anything to you about taking

6   family medical leave?

7        A.   No, ma'am.

8             (Exhibit 16 marked)

9        Q.   (By Ms. Phipps) I've handed you what's been

10  marked as Exhibit 16 to your deposition, and it is the

11  medical certification form signed by one of your doctors

12  and also signed by you on the second page.  If you would

13  just confirm for me that that's your signature on the

14  bottom of the second page.

15       A.   Yes, ma'am.

16       Q.   And it's dated February 17, 2010?

17       A.   Yes, ma'am.

18       Q.   All right.  Do you know what -- what doctor

19  signed this?

20       A.   No.  I can't tell by his handwriting, no, ma'am.

21       Q.   Okay.  I can't either.  But anyway --

22            MR. PECKHAM:  I can tell you who it is.

23            MS. PHIPPS:  Well, no, because you're not

24  testifying.  Hold on.

25       Q.   (By Ms. Phipps) Now, this says that you would be



```
 1   in the hospital in February 2010 to have dialysis catheter

 2   placed to initiate dialysis, correct?  Is that right?

 3        A.  Yes, ma'am.

 4        Q.  Okay.  And that -- in Section 5 it says, "Patient

 5   will return to work on March 15, 2010.  Patient will

 6   continue to" -- it says due, but "do dialysis three days a

 7   week."

 8              Do you see that?

 9        A.  Yes, ma'am.

10        Q.  All right.  All right.  So, do you know if this

11   was provided to Kim Stubbs, Exhibit 16?

12        A.  I don't know.

13        Q.  All right.  Did you -- you do recall going out on

14   family medical leave to have this dialysis catheter

15   placed?

16        A.  Yes, ma'am.

17        Q.  And was it this time, February 2010, that you

18   discovered that you were -- you were diagnosed with end

19   stage renal failure?

20        A.  No.

21        Q.  Okay.  When were you diagnosed with end stage

22   renal failure?

23        A.  When they told me, I was going -- it was a few

24   months beforehand.

25        Q.  Before when?
```



```
 1        Q.  All right.

 2        A.  Can I provide one --

 3                  MR. PECKHAM:  Answer her questions.

 4        A.  Yes, ma'am.  I mean, yes, sir.

 5        Q.  (By Ms. Phipps) Was there some episode that

 6   triggered the analysis of your kidney?  Did you have

 7   some sort of sickness, ill -- sickness -- acute

 8   sickness that caused you to have to go in for an

 9   examination?

10        A.  Yes, ma'am.

11        Q.  What was that?

12        A.  I started swelling.

13        Q.  Your body?

14        A.  My legs.

15        Q.  Your legs started swelling?  Okay.  And that was

16   sometime, like, in 2009, the fall of 2009?

17        A.  (Witness nods head affirmatively.)

18        Q.  Is that a yes?

19        A.  Yes, ma'am.

20        Q.  Okay.  All right.  Now -- so, you go in, you have

21   the -- whatever surgery you're going to have, and do you

22   actually -- did you actually start dialysis while you were

23   out on FML -- family medical leave?

24        A.  Yes.

25        Q.  Okay.  All right.  And you -- we understand that
```



```
 1   you attempted to return to work -- return to work around
 2   March 150th, 2010.
 3                  Does that sound right to you?
 4        A.   That sounds right to me, yes.
 5        Q.   Okay.  What did you do in order to facilitate
 6   your return to work?  Who did you talk to at Liondell or
 7   Take Care in order to come back to work?
 8        A.   Best I can remember is I had a return to work
 9   slip.  I had -- I believe I -- I believe I went to
10   Kimberly first and -- and -- and at that time things got a
11   little -- it was like, "Yes, you can.  Here's my return to
12   work slip."  And it was, "No, you cannot return to work."
13        Q.   That's what Kimberly told you?
14        A.   I believe it come down from somebody higher
15   above.
16        Q.   Okay.  So, you went to see Kimberly and you
17   handed her your return to work slip?
18        A.   Uh-huh.  (Witness nods head affirmatively.)
19        Q.   Is that right?
20        A.   I believe so.
21        Q.   Okay.  And then how was it -- how long was it
22   before you discovered that Kimberly was saying you
23   couldn't come back to work right then?  Was that the same
24   day?
25        A.   Same day.
```



1    Q.   All right.   Did you talk to anyone at Equistar

2  about your return to work that same day?

3    A.   No.   I don't think I did.   But if you have

4  something to document anything to refresh my memory, I

5  would be gladly --

6    Q.   No, I don't.   I was just going --

7    A.   Because I -- I was -- that day was -- that was

8  just a bad day for me.

9    Q.   Uh-huh.   Well, was Kimberly mean to you?

10    A.   No.   It wasn't that she was mean.   It was that I

11  was upset about them saying no.

12    Q.   Okay.   Did she tell you why you couldn't return

13  to work that day?

14    A.   No.

15    Q.   Okay.   All right.   So, what did you do after

16  Kimberly said you couldn't return to work?   What did you

17  do about trying to get back to work after that?

18    A.   Well, I requested to talk with Dr. Withers to

19  find out why.

20    Q.   Okay.

21    A.   Because I wanted to know the whole picture and --

22  go ahead.   I'm sorry.

23    Q.   Okay.   Did Kimberly tell you Dr. Withers was

24  saying that you weren't approved to return to work yet?

25    A.   I believe -- yes.



1  there about kidney -- renal kidney failure, and that was

2  why -- this was my reason why you're not going -- going

3  back to work.  The conversation went on to say that -- you

4  know, he looked at me and said, "Well, what would you do?"

5  And I kind of didn't know how to reply to him at the time.

6  I should have said, "Back to work."  That's what I wanted.

7  I wanted to go back to work, you know.  That's what I do.

8  That's what I've done all my life.  I've worked.

9      Q.  Okay.  Did you talk to -- after you talked to

10  Dr. Withers, did you talk to anyone at Equistar about the

11  fact that you weren't being approved to return to work at

12  that time?

13      A.  No.  I left the building after that.

14      Q.  All right.  Did you ever contact Keith Hopkins or

15  anyone else -- HR at Equistar -- to find out if there was

16  more you could be doing?

17      A.  I contacted -- yes, I -- I contacted people

18  before I talked to Dr. Withers.

19      Q.  Okay.  Who did you speak to?

20      A.  I talked to -- I talked to an HR or HR department

21  or a head HR person because I wanted to talk to

22  Dr. Withers because I couldn't get in touch with him.  I

23  was -- wanted to know why -- why, what, and everybody --

24      Q.  Do you remember who you --

25      A.  -- said no.



1   to look at it page by page.  The first page, it says you

2   report to the liability manager, correct?

3       A.  Yes, ma'am.

4       Q.  And was Keith Hopkins the reliability manager?

5       A.  At this time, yes, ma'am.

6       Q.  Okay.  All right.  And if you look at the job

7   tasks and frequency -- rather than read it all into the

8   record, I'll just have you look at it and tell me if you

9   agree with the job tasks, that these were job tasks that

10  you performed.

11      A.  (Witness reviews the document.)

12              MR. PECKHAM:  For clarification, are you

13  asking what's in all three of those boxes on that first

14  page or just that first box?

15      Q.  (By Ms. Phipps) All three boxes under "job

16  tasks."

17              MR. PECKHAM:  Got you.  Thank you.

18      A.  Yes, ma'am.

19      Q.  (By Ms. Phipps) These were all job tasks

20  that you performed; is that right, sir?

21      A.  Yes, ma'am.

22      Q.  And then next to that there's a column that's

23  titled "frequency."

24              Do you agree with the frequency that's

25  listed associated with each of those tasks?



1    A.   I'm sorry.  I'm reading out to myself.

2    Q.   Did you hear my question?

3    A.   Yes, ma'am, I heard your question.  I -- I dis --

4  well, I disagree with "occasional."

5    Q.   Okay.  How would you describe it?  Let's take the

6  first box.

7    A.   The first box?

8    Q.   Yes, where it says "Walking, climbing --

9  climbing, walking on elevator platforms, carrying tools,

10 grasping, reaching, maneuvering, and working in tight

11 places, repetitive hand/arm tasks, kneeling, squatting."

12   A.   Every day.

13   Q.   Every day?  Okay.  All right.  The second box,

14 "Must be able to perform unit inspections of rotating

15 machinery systems to include, but would not be limited

16 to" -- again, climbing, manipulation of various hoses,

17 grasping, reaching at various heights, taking readings of

18 pressure, temperature, vibration.  I'm not going to read

19 it all, but --

20   A.   Right.  Yes, ma'am.  I -- this was almost an

21 everyday task.

22   Q.   So, it would be more than occasional?

23   A.   It would be more than occasional.

24   Q.   Okay.  Would you say if you worked -- did you-all

25 work 10-hour days or 8-hour days?



1       A.   10-hour days.   Four 10s.

2       Q.   Would you spend at least five hours a day on the

3   items in the first block and --

4                   MR. PECKHAM:   Objection.   Form.

5       A.   I would say -- I'm trying to remember how long we

6   were out.   Yes, I would say five hours.   Yeah, five hours

7   a day easily.

8       Q.   (By Ms. Phipps) Okay.   And what about in the

9   second box which starts, "Must be able to perform

10  routine unit inspections"?   How -- what -- how many

11  hours a day would you perform those tasks?

12      A.   Well, it's performing vibration routes.

13  Vibration routes are every day.

14      Q.   And how much -- what percentage of your day would

15  you spend on that?

16      A.   Half a day or more.   Depending on --

17      Q.   Okay.   So, that's five hours?

18      A.   Yes, ma'am, depending on what's happening out in

19  the field.   It could sometimes be up to a 16-hour day or

20  more.

21      Q.   Okay.   And then it says, "Must be able to perform

22  computer tasks to include e-mail correspondence."

23                  How much of your day would you spend on

24  that?

25      A.   Well, after every day I would come in, I would



1   download.  I could say, you know, four hours or more --

2   four or five.  I mean, I would work it out where I can

3   work -- I do my routes, I download, which will take -- you

4   know, it could be four hours, three hours a day.  And then

5   some -- and then the next day it could be -- when I'm

6   analyzing all the data and doing reports, it could be most

7   of the day.

8        Q.  Okay.  So, which of these -- strike that.

9             As I understand it, you were the only

10  condition monitoring analyst at the BCO facility?

11       A.  Yes, ma'am.

12       Q.  All right.  So, does that mean you worked most of

13  the day alone?

14       A.  Yes, ma'am.

15       Q.  All righty.  Would you have to work around hot

16  equipment --

17       A.  Yes, ma'am.

18       Q.  -- that could burn you if you touched it?

19       A.  Yes, ma'am.

20       Q.  Okay.  Would you have to maneuver and work in

21  tight places?

22       A.  Yes, ma'am.

23       Q.  Would you typically get a break during the day?

24       A.  Yes, ma'am.

25       Q.  You would?  How long a break would you get?



```
 1        A.   We get three breaks a day.

 2        Q.   Three?

 3        A.   Yes, ma'am.  We got one at 9:00, one at lunch,

 4    and then around 2:00 o'clock or 3:00.

 5        Q.   Were the 9:00 and 3:00 o'clock breaks 15-minute

 6    breaks?

 7        A.   15-minute breaks.

 8        Q.   And how long did you get for lunch?

 9        A.   Half an hour.

10        Q.   Okay.  And you would have to be available after

11    hours for emergency response?

12        A.   Yes, ma'am.

13        Q.   Exactly what would you do in an emergency?  What

14    would be your role?

15        A.   Emergency response would mean any piece of

16    equipment that they thought had a problem, I would go out

17    there and analyze the problem for them.

18        Q.   Oh, okay.

19        A.   It would take anywhere from being there -- it

20    could be there 10 minutes finding out an operator didn't

21    start up a piece of equipment correctly and I would show

22    them how to start it up, or it could take all -- all day

23    or all night or the next day.

24        Q.   How frequently would you actually have to go out

25    in these after-hour emergency responses?
```



1       A.  How frequently?

2       Q.  Yes, sir.

3       A.  I could say -- that's a very good question.

4       Q.  More than once a week?

5       A.  Maybe once a week, maybe -- and sometimes it

6    could be two or three times a night or a day.  It's a

7    chemical plant is what I have to say to that.  Whenever

8    they need me, that's when I come.

9       Q.  And there was no backup for you?

10      A.  I did have backups, but they were at other

11   facilities and I would have to call them and say, you

12   know, "Hey, I need help" or, "Hey, I've been out here all

13   night."  And I could either call straight to them or -- I

14   didn't even have to go through Keith on that.

15      Q.  Okay.

16      A.  I just had to -- I would call up to La Porte and

17   say, "Hey, I need -- need you."

18      Q.  Did you ever actually see the recommendation

19   Dr. Withers prepared for Equistar with regards to your

20   returning to your job?

21      A.  Not until after -- way after we talked.

22      Q.  Okay.  You mean long after you and Dr. Withers

23   talked?

24      A.  Yes.  That was after they let me go.

25      Q.  Okay.  You mean you saw the restrictions after



1    property, or could you have driven a golf cart?

2        A.   I could have driven a golf cart.

3        Q.   And then No. 4 is "no work around unguarded

4    rotating equipment."  Now, you told me there was no

5    unguarded -- unguarded rotating equipment, correct?

6        A.   Yes, ma'am.

7        Q.   So, you could have complied with that

8    restriction?

9        A.   I could have complied with it.

10       Q.   Then No. 5, not to work more than 30 minutes

11   without a 15-minute break in a cool environment when the

12   heat index is 90 or higher.

13               Do you see that?

14       A.   Yes, ma'am.

15       Q.   Could you have complied with that restriction?

16               MR. PECKHAM:  Objection.  Form.

17       A.   Yes, I could have complied with it.  It would

18   have made my day longer, but I could have complied with

19   it.

20       Q.   (By Ms. Phipps) Okay.  No. 6, will not -- he was

21   recommending that you not be available for after-hours

22   emergency for a minimum of approximately 15 hours per

23   week.

24               Would that have been a problem for you?

25   Could you have complied with that restriction?



1             MR. PECKHAM:  And I'll object to the form.

2    Go ahead.

3       A.  I have -- this is -- will not be available after

4    hours emergency response for a minimum of approximately 15

5    hours per week.

6       Q.  (By Ms. Phipps) So, you would have 15 hours

7    per week where you weren't available.

8       A.  I would have -- my -- nine hours, 45 minutes.

9       Q.  I'm sorry?

10      A.  Nine hours and 45 minutes I'm -- couldn't comply

11   with that.  Nine hours is all I would be gone.  I'm sorry.

12   Three hours -- three hours, 15 minutes in that chair,

13   three days a week.  That's it.

14      Q.  Oh, I see.  So, you --

15      A.  That's the only thing -- if I were to be called

16   in at that time during dialysis is the only thing they

17   would have to -- I'm sorry -- what is the word?

18            MR. PECKHAM:  Accommodate.

19      A.  Accommodate me for.

20            MR. PECKHAM:  Sorry.  It's the only time

21   I'll fill in the blank.

22      A.  Thank you.

23            MS. PHIPPS:  I'll remember that.

24            MR. PECKHAM:  Don't hold me to it.

25      Q.  (By Ms. Phipps) Is it your testimony that

MATTHEW KING
KING vs. EQUISTAR CHEMICALS

October 03, 2012
100

1    after dialysis you could have -- on the days you had

2    dialysis after you received the dialysis you could

3    return to work?

4        A.  Yes, ma'am.

5        Q.  Okay.

6        A.  Can I -- well --

7        Q.  So, the only restriction that you would have had

8    difficulty -- that would have been a difficulty for you

9    would be No. 1, which is not to work alone, correct?

10       A.  The only reason I answered that is you asked me

11   that -- was there anybody else that would be there to help

12   you?

13       Q.  Right.

14       A.  And I didn't consider that a restriction.  I

15   actually don't need anybody else to help me.

16       Q.  I understand that's what you're saying, but the

17   restriction is that you not work alone.  So, I'm asking

18   was there someone else who could have worked with you so

19   that you could have complied with this restriction?

20       A.  At the facility at that time?

21       Q.  Yes.

22       A.  No.

23       Q.  Okay.

24       A.  But the way we worked at Liondell is I have

25   coverage through -- well, at the time I left was three



Case 4:12-cv-00341   Document 44-2   Filed on 02/01/13 in TXSD   Page 32 of 60

MATTHEW KING                                    October 03, 2012
KING vs. EQUISTAR CHEMICALS                              102

1  actually be accommodated?
2            MR. PECKHAM:  Objection.  Form.
3       A.  After the accommodations -- after I found out
4  what the restrictions were --
5       Q.  (By Ms. Phipps) Well, let me stop you
6  because you said you didn't find out about the
7  restrictions until after you were terminated.  I mean
8  before you were terminated did you ask anyone at
9  Lion -- at Equistar if these restrictions from
10  Dr. Withers could be accommodated?
11      A.  Before?
12      Q.  Yes.
13      A.  I didn't even get the restrictions until after I
14  left.
15      Q.  Okay.  So, you never asked for an accommodation
16  from -- from Equistar?
17            MR. PECKHAM:  Objection.  Form.
18      Q.  (By Ms. Phipps) Other than being let off for
19  dialysis.
20      A.  I -- I still don't understand where you're going
21  with this question.  I'm sorry.
22      Q.  Let me ask you a question.  I just need to know
23  whether you asked anyone at Equistar if the restrictions
24  which had been recommended by Dr. Withers --
25            MR. PECKHAM:  That he didn't know about?



1    A.   Yes.

2    Q.   What happened?

3    A.   That I -- certain things are coming up.

4    Q.   Okay.

5    A.   I was told on the phone that it was due to my

6  health.   That's what I was told on the phone.

7    Q.   By Mr. Hopkins?

8    A.   Yes.

9    Q.   Okay.   Sitting there today, do you know if Dr.

10  Withers recommended that you be terminated?

11    A.   No, I didn't know Dr. Withers was -- no.

12            MR. PECKHAM:   We've been going about an

13  hour, whenever you find a stopping place.   I know you're

14  in a -- in a -- in a train here.

15            MS. PHIPPS:   Give me just a couple minutes.

16            MR. PECKHAM:   And we probably -- at the

17  next break, we probably need to take about 10 or 15

18  because Mr. King's stomach is rumbling almost as loud as

19  mine.

20            MS. PHIPPS:   Is that Mr. King's stomach?   I

21  thought it was mine.   We can take a break, yeah.

22            VIDEOGRAPHER:   Going off the record.   It's

23  10:20 a.m.

24        (Recess from 10:20 a.m. to 10:37 a.m.)

25            VIDEOGRAPHER:   We're now back on the



```
1    record.  It's 10:37 a.m.
2         Q.  (By Ms. Phipps) Okay.  Mr. King, before we
3    left for break we were talking about your -- about
4    the restrictions which had been recommended by
5    Dr. Withers.  Before we left for break you testified
6    that you didn't know about those restrictions --
7    specific restrictions until after you had been
8    terminated.
9              Is that -- do you want to change any of
10   that testimony?
11             MR. PECKHAM:  Objection.  Form.
12        A.  No, ma'am.
13        Q.  (By Ms. Phipps) Okay.  All right.  We also
14   talked a bit about if you were performing your job --
15   well, let's say it like this.
16             When you were performing your job in the
17   field inspecting rotating equipment at Equistar --
18        A.  Yes, ma'am.
19        Q.  -- would there be any certain operational people
20   that you usually saw throughout the day, any specific
21   people?
22        A.  I would see -- I would see each operator of each
23   unit.
24        Q.  You would see the operator of each unit?
25        A.  Yes, ma'am.
```



1   that happen.

2              MS. PHIPPS:  I'm not arguing.  He's giving

3   me answers that I need to respond to, and that's what I'm

4   doing.

5              MR. PECKHAM:  All right.  Then don't

6   misrepresent what he says.

7              MS. PHIPPS:  So, let's go back to the

8   beginning -- well, he just has to remember what he said.

9              MR. PECKHAM:  Yes, that's exactly right,

10  and so do you if you're going to ask questions about it.

11             MS. PHIPPS:  I think the record will be

12  clear.

13             MR. PECKHAM:  All right.

14      Q.  (By Ms. Phipps) Let's move on, Mr. King.

15  You testified that you didn't see the restrictions

16  from Dr. King -- from Dr. Withers -- excuse me --

17  until after you had been terminated, correct?

18      A.  Yes, ma'am.

19      Q.  And you can't exactly remember when that was,

20  when you actually saw the restrictions; is that right?

21      A.  Yes, ma'am.

22      Q.  All right.  My question to you is:  Did you

23  attempt to apply for work at Liondell in any other

24  position after you learned you were terminated?

25      A.  Sorry.  That just --



1           MR. PECKHAM:  Just answer her question,

2   Matt.

3        A.  All right.  No, ma'am.

4        Q.  (By Ms. Phipps) All right.  And why not?

5        A.  Why not?  Again, I was terminated.  I couldn't

6   apply for any other positions.

7        Q.  Okay.  All right.

8        A.  I was terminated because of my illness.

9        Q.  Okay.  Did you ask -- once you learned what the

10  restrictions were, did you contact Liondell to see -- or

11  Equistar to see if those restrictions could be

12  accommodated in some new position?

13       A.  No, ma'am.  Once they said I was terminated, that

14  was it.

15       Q.  Sitting here today, do you know if Dr. Withers

16  made any decisions about whether your restrictions could

17  be accommodated?

18       A.  Say that again one more time, please.  I'm sorry.

19       Q.  Do you know if Dr. Withers made any restrictions

20  about whether -- I'm sorry.

21           Do you know if Dr. Withers made any

22  recommendations to the people at Equistar about whether

23  your restrictions could be accommodated, the restrictions

24  that he had recommended?

25           MR. PECKHAM:  That's as he sits here today?



1    Q.   Okay.  And because he didn't, you believe that

2   his recommendations were unfounded?

3                MR. PECKHAM:  Objection.  Form.  You can

4   answer.

5    A.   To my knowledge, yes.

6    Q.   (By Ms. Phipps) All right.  Do you believe

7   Dr. Withers was trying to interfere with your -- the

8   exercise of your right to take FMLA leave?

9                MR. PECKHAM:  Objection.  Form.

10   A.   He didn't -- say it one more time.

11   Q.   (By Ms. Phipps) Do you know -- well, do you

12  believe that Dr. Withers interfered with your right

13  to take FMLA leave?

14               MR. PECKHAM:  Same objection.  You can

15  answer.

16   A.   He -- I mean, I got to take my FMLA leave.

17   Q.   (By Ms. Phipps) All right.  Do you believe

18  he was retaliating against you -- retaliating against

19  you for taking FMLA leave by writing those

20  recommended restrictions?

21               MR. PECKHAM:  Object to form.

22   A.   Again, I got to take my FMLA leave.

23   Q.   (By Ms. Phipps) Right.

24   A.   What I think he did was he did -- in my best

25  knowledge, there was a retaliation.



```
1    out, I'll be more than happy to oblige you.
2         Q.  Okay.  All right.
3         A.  I need some help.
4         Q.  All right.  I'll keep on while I look for that.
5    So --
6                   MR. PECKHAM:  We'll stipulate if he
7    received it, he received it.
8                   MS. PHIPPS:  Okay.  Right.  I'll let you
9    look at this, and we can -- that's not critical for me to
10   prove it up right now, but that's what -- we'll be
11   producing that if we have to into evidence.
12        Q.  (By Ms. Phipps) But -- so, you were -- you
13   were -- you don't remember -- I think I started down this
14   road, Mr. King --
15        A.  Yes, ma'am.
16        Q.  -- of asking if you were taking -- if you applied
17   for any job as a vibrations tech, and you said you applied
18   for any job because you were in danger of losing your
19   home; is that right?
20        A.  Yes, ma'am.
21        Q.  But you're not in danger of losing your home now?
22        A.  No, ma'am.
23        Q.  You applied for long-term disability benefits.
24   We discussed that a minute ago.  Right?
25        A.  Yes, ma'am.
```



1      Q.   Yes.

2      A.   No.

3      Q.   Okay.   Okay.   Back to your conversation with

4   Keith Hopkins in April of 2010.   Okay.   Your recollection

5   is that Keith Hopkins said to you that you were being

6   terminated because of your health; is that correct?

7      A.   Yes.

8      Q.   During that conversation, did he actually ever

9   discuss with you the fact that there had been restrictions

10  placed on you related to your return to work?

11     A.   No, not at this time.

12          MS. WILLIAMS:   Can we mark this one?

13          (Exhibit 21 marked)

14     Q.   (By Ms. Williams) Mr. King, I will give you a few

15  minutes to look over that, but what's been marked as

16  Exhibit 21 is your amended charge of discrimination; is

17  that correct?   Do you see that at the top?

18     A.   Yes.

19     Q.   Okay.   Let me know when you're comfortable, when

20  you're ready to talk about it.

21     A.   All right.   Yes, ma'am.

22     Q.   Okay.   Is that your signature on the bottom of

23  the second page of Exhibit 21?

24     A.   Yes, ma'am.

25     Q.   It's dated June 22nd, 2010; is that correct?



1    A.  Yes, ma'am.

2    Q.  I want to call your attention to the very first

3  paragraph of the second page.  It's Roman Numeral V, and

4  I'm going to read it into the record.  "On April 16th,

5  2010, I was told that I would not be able to return to

6  work by my supervisor.  I was told that with the

7  restrictions given by Dr. Withers (which have to this day

8  not been told to me or my doctor) that he cannot allow me

9  to return to work."

10                Did I read that correctly?

11    A.  Yes.

12    Q.  Is it accurate, then, that on April 16th when

13  you -- well, let me clarify.

14                When you say "my supervisor," are you

15  referring to Keith Hopkins here?

16    A.  Yes, ma'am.

17    Q.  Okay.  Is it accurate as reflected in your

18  amended charge that on April 16th Keith Hopkins told you

19  that there were restrictions given by Dr. Withers?

20    A.  I see this.

21    Q.  Is that accurate?

22    A.  Yes, it is accurate to the best that I can

23  remember.

24    Q.  Okay.  So, on April 16th it is a fact that

25  Keith Hopkins told you that there had been restrictions



1  placed on you affecting your ability to return to work and
2  that was the basis for the company's decision, correct?
3      A.   Like I said, to the best of what I can
4  remember -- I just don't remember the part with Withers,
5  but --
6      Q.   I mean, do you have any reason sitting here today
7  to dispute the statements that you made in your sworn
8  charge to the EEOC about what was said on April 16th?
9      A.   No, I did not.  No, I do not.
10     Q.   Okay.  And is it fair to say after reviewing the
11 charge that there's no reference in this charge at all to
12 any comments by Mr. Hopkins that you were told that you
13 couldn't return to work because of your health?
14     A.   No, there is not.
15     Q.   During your conversation with Mr. Hopkins on
16 April 16th did he recommend to you that you look for
17 other positions within the company?
18     A.   No.
19     Q.   Did you ask him about that?
20     A.   About other positions?
21     Q.   Yes.
22     A.   No, ma'am.
23     Q.   I want to go back and talk a little bit about
24 your job duties at Equistar.
25     A.   Yes, ma'am.



1    Q.  And I think if you'll turn to Exhibit 17 --

2    A.  Yes, ma'am.

3    Q.  It's the job site analysis, correct?

4    A.  Yes, ma'am.

5    Q.  And I want to talk about the -- the specific task

6    that's identified in the first box, "must be able to

7    perform build and inspection of rotating equipment."

8         Can you describe in a little bit more

9    detail exactly what you were required to do with

10   inspecting field equipment or inspecting rotating

11   equipment in the field?

12   A.  I took vibration readings on the equipment.

13   Q.  Where was the equipment located?

14   A.  In the unit.

15   Q.  Okay.

16   A.  In the plant.

17   Q.  I got it, yeah.  Was the equipment on the floor

18   or bottom level of the plant?

19   A.  Yes, ma'am.

20   Q.  Was there some equipment that was elevated?

21   A.  Yes, ma'am.

22   Q.  On the second -- let me finish.

23        MR. PECKHAM:  Watch out, Matt.

24   Q.  (By Ms. Williams) On the second level of the

25   plant?



1     A.   Finished?

2     Q.   I am.

3     A.   Yes, ma'am.

4     Q.   Was there more than two levels of equipment at

5   the plant?

6     A.   Yes, ma'am.

7     Q.   Okay.  How many levels of equipment was there?

8     A.   Maybe three levels, fin fans.

9     Q.   I'm sorry.  The last part?

10     A.   Three levels.  I said fin fans.  It's -- they are

11   the highest point of the plant where I would be taking

12   vibration readings.

13     Q.   And how did you access the equipment that was on

14   the second level?

15     A.   Stairs.

16     Q.   And the equipment that's on the third level?

17     A.   Stairs.

18     Q.   Okay.  Did you have a standard sort of operating

19   procedure for your -- your day with respect to your

20   inspection of the rotating equipment?  For example, did

21   you start on the third level, work your way down, on the

22   first level, work your way up, anything like that?

23     A.   I started on the bottom level -- started on the

24   bottom.  Well, it's my route.  I start on the bottom in

25   the yield plant and that's where our fin fans are at and I



1  do half the bottom and then go up to the top, do fin fans

2  and then come back down and go back to the bottom and work

3  all the bottom, rest of the bottom of the plant.

4      Q.  You mentioned earlier that there were -- that you

5  would see operators throughout your -- your day as you're

6  doing your inspections.

7      A.  Uh-huh.  (Witness nods head affirmatively.)

8      Q.  Did you more often see them on the bottom level

9  as opposed to the second or third level?

10     A.  Yes.

11     Q.  Okay.  Is it fair to say when you got to the

12  second level that there weren't any operators typically on

13  that level?

14             MR. PECKHAM:  Objection.  Form.

15     A.  I would see them less on the upper levels.

16     Q.  (By Ms. Williams) Okay.  Okay.  How long

17  would it take you to move -- and I'm excluding your

18  actual inspection activity.

19             When you're finished your inspection on the

20  first level and you're moving to the second level, how

21  long does it take you to get from the first level to the

22  second level?

23     A.  A few minutes.

24     Q.  Okay.  What's a few?

25     A.  To the second level?



```
 1        Q.  Yes.

 2        A.  A good two minutes.

 3        Q.  Okay.  And then --

 4        A.  Two, three -- yeah, two, three minutes at the

 5   most.

 6        Q.  When you were accessing the third level from the

 7   second level, how long did it take you to do that?

 8        A.  Another two, three minutes.

 9        Q.  Okay.

10        A.  It's just a flight of stairs.

11        Q.  Okay.  I'm just trying to get a general sense of

12   what the environment was like.  Between the -- or among

13   the first, second, and third level did you spend more time

14   typically on one level compared to the others, or was it

15   pretty much evenly split among the different levels?

16        A.  Well, I would have to -- there's nothing at that

17   point -- there's nothing on the second level, so I went

18   straight to the third level, and I spent a lot of time on

19   the top level because I had rows of machinery that I had

20   to inspect.

21        Q.  Okay.  I'm sorry.  You said at that point there

22   was nothing on the second level?

23        A.  Nope.  That's just still -- there's, like, a

24   second level, then there's a third level which is just

25   10 -- 10, 15 more feet above.  So, I would just -- a
```



1    quick -- quick jog up that ladder -- I mean the stairs.

2        Q.  So, you actually didn't have any inspection work

3    to do on the second level?

4        A.  Not on that unit.

5        Q.  In another unit?

6        A.  In the second unit I had a compressor called the

7    RGC, and that was on a second level.

8        Q.  Okay.

9        A.  And I was generally up there and I was taking

10   readings on it probably 15, 20 minutes.

11       Q.  Okay.

12       A.  And if I saw something wrong, it could take -- if

13   I had -- if I saw something wrong and I had to do a little

14   bit of an analysis up there, it could take a little bit

15   longer than that just depending on what I was looking for.

16       Q.  And how many units did you actually inspect?  You

17   divided it up into units.  Right?

18       A.  I did -- I did all the units.

19       Q.  How many are there?

20       A.  There's actually three -- three units.

21       Q.  Okay.  The second unit has equipment on the

22   first, second, and third levels; is that correct?

23       A.  It has it on the first -- I'm trying to think if

24   there was a fin fan up there.  The second unit, I think --

25   I believe there was just a bottom unit, just everything on



1    the bottom.

2        Q.   (By Ms. Williams) Okay.  What about the

3    third unit?

4        A.   I'm sorry.  I'm -- I'm sorry if I'm mumbling.

5    I'm just trying to remember the units.

6        Q.   Okay.

7        A.   No, I think most of the upper was in the EL side.

8    And glycol, everything was -- in the first unit was -- I

9    think everything was on the bottom.  I think everything

10   was -- just one unit, I believe, had all the fin fans.

11       Q.   Okay.  And those were on the very top level?

12       A.   Very, very top level.

13       Q.   Okay.  Except for the second unit, then -- the

14   second unit did not have any equipment on the second

15   level, correct?

16       A.   Hold on.

17       Q.   Okay.

18       A.   See, but -- vibration-wise, no.  Oil-wise, yes

19   because I did oil stuff, too, for the unit.  So -- and I

20   did -- whatever needed oiling.  The fire monitors had oil

21   boxes on them that I had to drain and change and clean

22   when I was there, too.

23       Q.   Okay.  Let me make sure that I -- I just want to

24   make sure that I get the record clear.  I appreciate your

25   efforts to remember.  I know it's been a while.



1      A.  Yes, ma'am.

2      Q.  The first unit that you worked on had equipment

3   on the first level and the third level, correct?

4      A.  All right.  You have glycol.  You have another

5   unit.  If you're walking out the front door of the unit,

6   you have one, two, three.  The third unit has all the fin

7   fans.

8      Q.  And that's on every level, or is that just on the

9   top level?

10      A.  Just the top level, fin fans.

11      Q.  Anything on the bottom level or the second level

12   in the third unit?

13      A.  Bottom level is floor.  That's where all of your

14   pumps -- most of the majority of all of your pieces of

15   equipment are.

16      Q.  Okay.  Second level in the --

17      A.  There wasn't much on the second level, no, just

18   all the way up to the fin fans.

19      Q.  With respect to the second level, any equipment

20   of any kind on the first, second, or third levels of the

21   second unit?

22      A.  Yes.

23      Q.  Each level?

24      A.  Fire monitors that I had to change the oil in.

25      Q.  Okay.  So, is it correct that there was equipment



1    on the first, second --

2        A.   Almost every level, yes.

3        Q.   Hold on a second.  Let me finish.

4             Is it correct that there was equipment on

5    the first, second, and third level in the second unit?

6        A.   Yes.

7        Q.   And then the first unit --

8        A.   Yes.  There was stuff on the first, second, and I

9    can't recall about -- you know, fire monitors or -- there

10   was, I don't know, four or five fire monitors through the

11   unit, six monitors.

12       Q.   But you don't recall whether there was any

13   equipment on the third level of the first unit?  And

14   that's fine.  I just want to make sure the record's clear.

15            You don't recall any equipment on the

16   first --

17       A.   Second level, there was a mix -- a mixer that was

18   one, two -- third -- third level up on the first unit

19   there's a mixer.

20       Q.   Okay.

21       A.   That I had to take vibration readings on the

22   motor and the carrier.

23       Q.   Okay.  So, then, we've got all levels covered on

24   the first unit, correct?  There's something on every level

25   in the first unit?



1      A.  Yes.

2      Q.  Okay.  It's all right.  It's all right.  It was

3   tedious.  I apologize for that.  I just wanted to make

4   sure that our record was clear, okay?

5              How large is this equipment that you're

6   dealing with?

7      A.  Anywhere from a few inches to 30-foot long and, I

8   don't know, 10-foot high.

9      Q.  Okay.

10     A.  I mean, that's a wide --

11     Q.  Sure.

12     A.  This is a chemical plant.  I mean, we've got

13  everything.

14             MR. PECKHAM:  Marlene, I know you're going

15  along and it wasn't that long ago we took a break, but I

16  may need a comfort break in a few minutes whenever you

17  find a stopping point.

18             MS. WILLIAMS:  Okay.  We can stop.  This is

19  good.

20             VIDEOGRAPHER:  Going off the record.  The

21  time is 12:11 p.m.

22         (Recess from 12:11 p.m. to 12:37 p.m.)

23             VIDEOGRAPHER:  Now back on the record.

24  It's 12:37 p.m.

25     Q.  (By Ms. Williams) Mr. King, I wanted to pick

1  the company was evaluating your ability to return to work
2  safely?
3      A.   The restrictions come, like I said, after --
4  after everything, I believe.
5      Q.   Okay.  But that's not my question.  I'm saying
6  from the -- when you submitted the return to work form up
7  until the time that you were notified that you were
8  terminated, is it your testimony that nobody ever informed
9  you that the company was actually evaluating your ability
10 to safely return to work and whether you could do that
11 given your condition?
12     A.   I think that -- no, I don't think I really was
13 notified of what was going on.
14     Q.   Okay.  Do you think that Equistar had a
15 responsibility to evaluate whether you could safely return
16 to work given the leave you had taken and your medical
17 condition?
18     A.   Yeah, I think they had a responsibility.  I mean,
19 to take, you know, some type of action.
20     Q.   Okay.
21     A.   I mean, I do have some type -- you know, I've got
22 renal failure.  So, I guess they would have to take
23 something.
24     Q.   Okay.  Do you have any objection or problem with
25 the fact that Equistar actually evaluated your ability to



1  safely return to work?

2      A.  I don't think they evaluated me safely to come

3  back to work.

4      Q.  Okay.

5      A.  I was never evaluated.  I was never -- no one did

6  an evaluation on me.

7      Q.  Okay.  You mean a physical evaluation?

8      A.  Physical evaluation.

9      Q.  Let me rephrase the question.  Do you -- do you

10  think that it was appropriate for Equistar to consider

11  whether or not it was possible for you to safely return to

12  work and if --

13      A.  Say that again, please.

14      Q.  Do you think that it was appropriate for Equistar

15  to consider whether or not you could safely return to

16  work?

17      A.  In my opinion, I guess they have a right to, yes.

18      Q.  Did you think it was appropriate for them to do

19  that?

20              MR. PECKHAM:  I'm going to object to form.

21      Q.  (By Ms. Williams) Okay.

22      A.  Like I said, every company has a right to --

23      Q.  Sure.  I know they could do it, but I'm asking

24  you whether or not that you think it was frankly the right

25  thing to do, for them to consider whether you could safely



MATTHEW KING
KING vs. EQUISTAR CHEMICALS

October 03, 2012
168

```
1   any of the description of your --
2       A.  No, no, no.
3       Q.  Let me finish -- of your work duties in this
4   particular form, do you?
5       A.  No, ma'am, I do not.
6       Q.  Okay.  And you've already testified that it
7   accurately describes the work that you did.  Right?
8       A.  Yes, ma'am, as far as -- yes, ma'am, that's my
9   job tasks.
10      Q.  And you made some clarifications with respect to
11  the frequency of some of the things you do.  Right?
12      A.  Yes, ma'am.
13      Q.  Okay.  Did anyone at Equistar ever deny you the
14  right to take FMLA leave at any time?
15      A.  No.
16      Q.  Okay.  Is it your allegation in this lawsuit that
17  Equistar interfered with your rights under the Family
18  Medical Leave Act?
19      A.  Say that again, please.  I'm sorry.
20      Q.  I don't remember it.
21              (Discussion off the record.)
22          (The record was read as requested.)
23      A.  No, they didn't interfere.  I think they gave me
24  my, you know, Family Leave Act.
25      Q.  (By Ms. Williams) Okay.
```



1     A.  Yes.

2     Q.  Okay.  Describe for me in your own words what

3  Equistar did wrong in your opinion.

4     A.  There's supposed to be a -- how do you put it?

5  Equistar is supposed to be able to -- there's supposed to

6  be a talk between the two of us and we're supposed to be

7  able to talk about, you know, my accommodations.  We're

8  supposed to talk about everything for the -- the dialysis

9  and it -- it never happened.  There was no -- nothing

10  between us.  And I know I'm not wording that properly, but

11  since there wasn't any of that, I believe that was -- you

12  know, that was part of the discrimination.

13     Q.  Okay.  Do you think that -- okay.  Other than

14  failing to talk to you about accommodations or about your

15  dialysis, did Equistar do anything else wrong that you

16  think was disability discrimination?

17     A.  Well, I think that Equistar -- well, as far as --

18  as -- no.  No, I don't think there is.

19     Q.  You also allege that Equistar retaliated against

20  you.  Can you describe for me what Equistar did that you

21  consider retaliation?

22     A.  Well, retaliation is they -- they retaliated by

23  firing me.  They fired me.

24     Q.  Why did they fire you, in your opinion?

25     A.  In my opinion, because I am a dialysis patient.



1      Q.  Any other retaliation?

2      A.  No, I'm -- I mean, for what I know of, you know,

3   I wasn't in the background of all this.  I know that

4   they -- I mean, it was just -- they fired me, ma'am,

5   because I'm a dialysis patient.

6      Q.  You also allege that Equistar violated the Family

7   and Medical Leave Act.  You've already testified that you

8   don't think that Equistar interfered with your ability?

9      A.  Yes.  I'm sorry.

10     Q.  Equistar didn't interfere with your ability to

11  take FMLA leave, correct?

12     A.  They did not -- what -- well, yes.

13     Q.  Okay.  So, what do you think Equistar did that

14  violated the Family Medical Leave Act?

15     A.  They called me while I was on my Family Leave Act

16  and fired me on my Family Leave Act, while I was still on

17  family leave.

18     Q.  Okay.  Anything else?

19     A.  No, ma'am.

20     Q.  Okay.

21          MR. PECKHAM:  Don't ask him how much the

22  attorneys' fees are.

23     Q.  (By Ms. Williams) How much are your

24  attorneys' fees?

25     A.  That's between me and Charles.



1  whether or not you ever worked at unprotected

2  heights?

3              MS. WILLIAMS:  Objection.  Form.

4      A.  Never.

5      Q.  (By Mr. Peckham) What about -- what about

6  as -- we talked about company vehicles.  What about

7  working around unguarded rotating equipment?

8              MS. WILLIAMS:  Objection.  Form.

9      A.  No.  Everything's guarded.

10     Q.  (By Mr. Peckham) Okay.  Do you see No. 6 on

11 that list as a restriction?

12     A.  Yes.

13     Q.  Can you tell me whether or not there were any

14 restrictions regarding your hours of work from Dr. Muniz

15 related to emergency response?

16     A.  There was none.

17     Q.  Do you -- do you have any knowledge as to whether

18 you would have -- scratch that.

19              Do you have any knowledge as to whether or

20 not Equistar would have been without emergency response

21 during the times that you were in dialysis?

22              MS. WILLIAMS:  Objection.  Form.

23     A.  They would not.

24     Q.  (By Mr. Peckham) Why not?

25     A.  Because there is three -- three other vibration



1     Q.  (By Ms. Williams) Did you ever make an

2  accommodation request to anyone at Equistar?

3     A.  No.

4           MS. WILLIAMS:  Okay.  That's all I have.

5  I'll pass.

6            FURTHER EXAMINATION

7     Q.  (By Mr. Peckham) All right.  Mr. King, you were

8  just asked a question about accommodation requests.  Would

9  you please take a look at Exhibit No. 16?  Do you see

10  that?

11     A.  Yes.

12     Q.  Would you please take a look at No. 5 and read

13  out loud the handwritten section?

14     A.  "PT will return to work on March the 15th of

15  2010.  PT will continue to do dialysis three days a week."

16     Q.  Okay.  Would you take a look at 5C and read the

17  handwritten section?

18     A.  "Patient will need to have dialysis three days a

19  week for the rest of the patient's life or until patient

20  gets a kidney transplant."

21     Q.  And can you see the date on the -- on the back

22  page of that?

23     A.  Yes.

24     Q.  What's the date?

25     A.  2-17th of '10.



```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION

3     MATTHEW KING                    )
                                      )
4     vs.                            )CASE NO.  4:12-cv-00341
                                      )
5     EQUISTAR CHEMICALS, L.P.,       )
      LYONDELLBASELL INDUSTRIES,      )
6     N.V., a/k/a LYONDELBASSEL,      )
      BENJAMIN FRANKLIN WITHERS,      )
7     III, M.D., AND TAKE CARE        )
      HEALTH SYSTEMS                  )
8

9                  REPORTER'S CERTIFICATE

10       ORAL VIDEOTAPED DEPOSITION OF MATTHEW KING

11                     October 3, 2012

12

13        I, Shauna Foreman, Certified Shorthand Reporter

14    in and for the State of Texas, hereby certify to the

15    following:

16        That the witness, MATTHEW KING, was duly sworn

17    by the officer and that the transcript of the oral

18    deposition is a true record of the testimony given by

19    the witness;

20            That the original deposition was delivered

21    to Victoria Phipps.

22            That a copy of this certificate was served on

23    all parties and/or the witness shown herein on

24    _____.

25            I further certify that pursuant to FRCP Rule
```



Page 202

1    30(f)(1), the signature of the deponent:

2                _____was requested by the deponent or a party

3    before the completion of the deposition and that the

4    signature is to be before any notary public and returned

5    within 30 days (or _____ days, per agreement of counsel)

6    from date of receipt of the transcript.  If returned, the

7    attached Changes and Signature page contains any changes

8    and the reasons therefor;

9                _____was not requested by the deponent or a

10   party before the completion of the deposition;

11               I further certify that I am neither counsel for,

12   related to, nor employed by any parties or attorneys in the

13   action in which this testimony is taken, and further that

14   I am not financially or otherwise interested in the outcome

15   of this action.

16         Certified to by me on this the 4th day

17   of October, 2012.

18

19                    _Shauna Foreman_

20                    Shauna Foreman, CSR
                      Texas CSR 3786
21                    Expiration:  12/31/2012
                      Esquire Deposition Solutions
22                    1001 McKinney, Suite 805
                      Houston, Texas 77002
23                    Tel. (713)524-4600
                      Firm No. 03
24

25

```
 1   COUNTY OF HARRIS   )

 2   STATE OF TEXAS     )

 3           I hereby certify that the witness was notified

 4   on _____ that the witness has 30 days (or

 5   _____ days, per agreement of counsel) after being

 6   notified by the officer that the transcript is available

 7   for review by the witness and if there are changes in

 8   the form or substance to be made, then the witness shall

 9   sign a statement reciting such changes and the reasons

10   given by the witness for making them;

11           That the witness' signature was/was not

12   returned as of _____, 2012.

13           Subscribed and sworn to on this the _____

14   day of _____, 2012.

15

16

17

18                      Shauna Foreman, CSR
                        Texas CSR 3786
19                      Expiration:  12/31/2012
                        Esquire Deposition Solutions
20                      1001 McKinney, Suite 805
                        Houston, Texas 77002
21                      Tel. (713)524-4600
                        Firm No. 03
22

23

24

25
```

