# EXHIBIT 2

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MATTHEW KING )
) CASE NO. 4:12-cv-00341
VS. )
EQUISTAR CHEMICALS, L.P., LYONDELLBASELL INDUSTRIES, N.V., a/k/a LYONDELBASSEL, BENJAMIN FRANKLIN WITHERS, III, M.D., AND TAKE CARE HEALTH SYSTEMS )

ORAL VIDEOTAPED DEPOSITION
MATTHEW KING
October 3, 2012

ORAL VIDEOTAPED DEPOSITION OF MATTHEW KING, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 3rd day of October, 2012, from 7:23 a.m. to 2:13 p.m., before Shauna Foreman, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Peckham, PLLC, 800 Bering Drive, Suite 220, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

2

APPEARANCES

FOR PLAINTIFF:
CHARLES H. PECKHAM, ESQ.
PECKHAM, PLLC
800 Bering Drive
Suite 220
Houston, Texas 77057
Telephone: 713-574-9044
Fax: 713-493-2255
E-mail: cpeckham@peckhampllc.com

FOR EQUISTAR:
MARLENE C. WILLIAMS, ESQ.
ANITA BARKSDALE, ESQ.
JACKSON WALKER
1401 McKinney
Suite 1900
Houston, Texas 77010
Telephone: 713-752-4200
Fax: 713-752-4221
E-mail: mcwilliams@jw.com

FOR TAKE CARE HEALTH SYSTEMS AND DR. WITHERS:
VICTORIA M. PHIPPS, ESQ.
LITTLER MENDELSON
1301 McKinney
Suite 1900
Houston, Texas 77010
Telephone: 713-951-9400
Fax: 713-951-9212
E-mail: vphipps@littler.com

ALSO PRESENT:
Damon Norris, Videographer
Dr. Benjamin Withers
Keith Hopkins
Barbara Dunlap

3

INDEX

| | PAGE |
|---|---|
| MATTHEW KING | |
| Examination by Ms. Phipps | 5 |
| Examination by Ms. Williams | 129 |
| Examination by Mr. Peckham | 185 |
| Further Examination by Ms. Phipps | 194 |
| Further Examinationn by Ms. Williams | 196 |
| Further Examination by Mr. Peckham | 197 |

EXHIBITS

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| 1 | 13 | Certificates |
| 2 | 23 | Application for Employment - Mistras |
| 3 | 23 | Personal History Questionnaire - Mistras |
| 4 | 37 | Application for Employment - Frank Crum |
| 5 | 39 | Application for Employment - Summit Staffing |
| 6 | 48 | E-mails |
| 7 | 53 | Offer of Employment - Q Pro |
| 8 | 55 | Application for Employment - Adminlstaff |
| 9 | 60 | Notes - Dr. Muniz |
| 10 | 66 | Application for Employment - Equistar |
| 11 | 71 | Employee FMLA Guide |

4

EXHIBITS (cont.)

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| 12 | 72 | Request for Family or Medical Leave |
| 13 | 72 | Request for Family or Medical Leave |
| 14 | 76 | Return to Work Certificate |
| 15 | 76 | Medical Disposition |
| 16 | 78 | Medical Certification Form |
| 17 | 87 | Job Site Analysis |
| 18 | 95 | Recommended Restrictions |
| 19 | 113 | Explanation of Benefits Letter |
| 20 | 114 | Personal Profile - Met Life |
| 21 | 140 | Charge of Discrimination |
| 22 | 169 | Authorization Form/Verification of Consent |
| 23 | 191 | E-mail 8/20/10 |

5

VIDEOGRAPHER: Today's date is October 3rd, 2012. We're now on the record. The time is 7:23 a.m.

MATTHEW KING,

having been first duly sworn, testified as follows:

EXAMINATION

MR. PECKHAM: Before you begin, we institute Rule 615, please. Go on ahead.

MS. PHIPPS: Okay. What is Rule 615?

MR. PECKHAM: It's the Rule.

MS. PHIPPS: Oh, the Rule. Okay.

Q. (By Ms. Phipps) All right. Mr. King, my name is Vicki Phipps, and I represent Take Care and Dr. Withers in this matter.

Do you understand that I represent the parties opposite to you in this lawsuit?

A. Yes, ma'am.

Q. All right. Have you ever been deposed before?

A. No, ma'am.

Q. All right. Well, I'll go over a few little rules that are -- that are easy to say but sometimes hard to follow.

The first is that the court reporter is taking down what we say today so that it's important that you give a verbal, audible response to any questions you

6

are answering, okay?

A. Okay.

Q. The other is that I might remind you if I see you nodding your head or shaking your head like we always do in normal conversation. I may just say, "Is that a yes or a no," okay?

A. Yes, ma'am.

Q. All right. If I ask you anything that you don't understand, I'm not trying to. So, just let me know and I'll be happy to rephrase it, all right?

A. Yes, ma'am.

Q. If you need a break after -- if there's no question pending on the table, I'm happy to allow you to leave or -- because I may need a break, too, as the day goes on. So, don't feel like you have to sit there if you need to take a necessity break or anything like that, okay?

A. Yes, ma'am.

MR. PECKHAM: What she's trying to say is if you don't know the answer to a question and you want me to tell you, it ain't going to happen.

Q. (By Ms. Phipps) No, that's not what I'm trying to say at all. That's his -- that's his rule. Okay.

Also -- let's see. You understand that the testimony you give today may be used if this case should go to trial?

7

A. Yes, ma'am.

Q. Are you on any medication today that might interfere with your ability to tell the truth?

A. No, ma'am.

Q. Are you on any medication today at all?

A. Yes, ma'am.

Q. What -- what medication are you on?

A. I'm on insulin, Novalog. I'm on blood pressure medicine. I'm on Gabapentin, and I take a vitamin for dialysis and -- let's see. I believe that's about it that I can remember.

Q. Okay. A question I ask everybody is regarding whether they have been convicted of any crime.

Have you been convicted of any crimes?

A. No, ma'am.

Q. Okay. Did you serve in the military?

A. No, ma'am.

Q. All right. Currently are you under a doctor's care?

A. Yes, ma'am.

Q. Can you tell me the names of the doctors who are currently treating you?

A. Dr. Muniz is my dialysis doctor, renal doctor. I have Dr. Romero is my general practitioner, and -- I mean, there is -- and Dr. Faust. I mean, he's part of the renal

8

patient -- he's another renal doctor.

Q. Dr. Frost?

A. Faust.

Q. F-A-U-S-T?

A. I believe so, yes, ma'am.

Q. Okay. And do you currently have medical insurance coverage?

A. Yes, ma'am.

Q. Okay. Is that through your employer?

A. Yes, ma'am.

Q. All right. Have you reviewed anything today in preparation for your deposition?

A. Yes, ma'am.

Q. Could you tell us what you reviewed?

A. Just what records were provided to me that I can remember.

Q. What records were those?

A. I'm just a little bit nervous. Can you give me a --

Q. Take your time.

A. Let's see. Basically just what was appointed to you-all. I mean, basically, that was -- I mean --

Q. Did you look at the lawsuit you filed?

A. That I can remember. I mean, basically what I filed, yes.



41

Self-disclosure Document. Do you see that? It should have Exhibit 3 on the front.
A. Yeah, this one.
Q. Okay. I want to just go over a few of the -- a little of the information you included in this personal history. Let's see. At the bottom of this exhibit you're going to see some type -- it looks like typewritten numbers, and I'm going to refer to those page numbers to help us move along quickly. So, I'll just say "turn to page" -- in this case, turn to Page 275, TCHS275.
Okay. Do you see that?
MR. PECKHAM: Excuse you.
Q. (By Ms. Phipps) Is this your handwriting?
A. Yes, ma'am.
Q. Okay. It indicates that you worked -- where it says "employment," you have down Q Pro from 11/01/10 to present.
Do you see that?
A. Yes.
Q. Okay. All right. So, you -- did you actually start working at Q Pro in November of 2010?
A. I filled out my paperwork in November.
Q. Okay.
A. I know it was for -- at Q Pro at -- in November, yes.

42

Q. So, did you get -- start getting paychecks from Q Pro in November of 2010?
A. I'm trying to think back. No. I filled out this paperwork, but I think I had to go through the interview with Marathon first. I filled out this, but I still had to go through the -- through --
Q. Right. This is your Mistras paperwork.
A. I'm sorry. I'm talking about Q Pro.
Q. Right.
A. You're asking Q Pro?
Q. Exactly.
A. I had to fill out -- as far as I can remember -- I don't think I was -- well, I don't think I was getting a paycheck, I mean, on that day yet.
Q. Okay. On November 1st, you mean?
A. On November the 1st.
Q. Right.
A. I don't think I was -- I had to go -- I filled out my paperwork at Q Pro.
Q. Right.
A. I had to go through the Marathon --
Q. Interview?
A. -- interview. And then after that, I think I got paid -- started getting paid.
Q. All right. You list Ishmail Cruz as your

43

supervisor contact name.
A. Yes, ma'am.
Q. And you told me you knew Ishmail before you actually applied at Q Pro?
Had you and Ishmail worked together before?
A. We never worked together. He was part of the inspection department, and I was part of rotating equipment.
Q. At Equistar or what company?
A. That was at -- when I worked for Fluor.
Q. Fluor Daniels?
A. Fluor Daniels.
Q. Okay. All right. Did you tell Ishmail why you had to leave Equistar?
A. Did I tell him why I had to leave Equistar? Actually, I didn't. A friend of mine did.
Q. A friend of yours told him?
A. Yes, that I -- I consulted him because he was somebody I could talk to. I needed somebody to talk to.
Q. All right. So, this friend -- do you know -- did Ishmail know -- did you and Ishmail ever talk about why you left Equistar?
MR. PECKHAM: And objection. Form.
A. I had mentioned it, yes. I had mentioned it to him.

44

Q. (By Ms. Phipps) What did you tell him about why you left Equistar?
A. Well, I told Ishmail that it was due to my renal disease.
Q. Okay.
A. And that was it, basically.
Q. Did anyone -- I notice on Page 276 of Exhibit 3 --
A. Yes, ma'am.
Q. -- you're asked for -- to provide a reason for leaving LyondellBasell, which is Equistar.
A. Yes, ma'am.
Q. And you put down "personal"?
A. Yes, ma'am.
Q. Did anyone at Q Pro or Mistras ask you what you meant by "personal"?
A. No.
Q. No?
A. They just took it as personal.
Q. Okay. Did you ask for any sort of accommodation for your medical condition at Mistras or Q Pro?
A. Yes, ma'am.
Q. What type of accommodation did you ask for?
A. Only accommodation I asked for is I need to take off three days a week at 3:00 o'clock so I could make it



by 4:00 o'clock to dialysis.
Q. Okay. And what part of Houston is your dialysis center located?
A. It's in League City.
Q. All right. And Mistras agreed to accommodate you in that way?
A. Mistras and Marathon agreed.
Q. Okay. You mentioned -- you list a person named Keith Brunkle, I think, as the person who can verify your activities. Is that right?
A. Keith Burnakle. I couldn't spell --
Q. Oh, Burnakle? Okay.
A. B-R-U-K-L-E.
Q. And who is he?
A. He was one of the engineers at Liondell that I worked closely with.
Q. When you applied at -- I'm going to say Q Pro/Mistras since it's the same company.
A. Yes, ma'am.
Q. Did you apply to be a vibrations analyst?
A. No, ma'am.
Q. Okay. And why not?
A. That's not what the position was for.
Q. So, you were applying for an existing position, the machinery -- the machine specialist position?

A. I was applying for machinery specialist.
Q. Did you have to go through a pre-employment medical exam at Q Pro/Mistras?
A. Yes, I believe. Yes.
Q. You did? Was that through their company doctor, or did you have to go to an off-site facility?
A. As far as I can remember, I think -- I know I had to go through a pre-employment -- I had to have a drug screening and all that. That was off-site.
Q. Uh-huh. But what about medical exam, other than drug screening?
A. I'm sorry. I really -- I can't remember.
MR. PECKHAM: By the way, Matt, if you don't remember, tell her you don't remember. She can work with that.
A. Okay. I just really can't remember.
Q. (By Ms. Phipps) Earlier you testified -- I just made a note that I need to get back to it -- that you were taking something called Gabapentin.
A. Yes, ma'am.
Q. Do you know what you're taking that for?
A. Yes, I do.
Q. What?
A. I have restless legs syndrome.
Q. I'm sorry?

A. Restless legs syndrome.
Q. And how does that -- if you don't take the Gabapentin, how does that affect your -- what impact does that have on your leg?
A. My legs? At nighttime when I get home and I lay down to bed, my legs just want to keep going. They just want to keep walking. They want to, you know, that's -- I mean, it's how I can explain it.
Q. How long have you had that, restless leg syndrome?
A. Man, it started probably pretty close because I -- right after I found out all this stuff had happened, it really kicked in.
Q. After you started dialysis?
A. No, ma'am. After I lost my job. It's just brought on by stress.
Q. Your doctors told you that restless leg syndrome -- the restless leg syndrome was brought on by stress?
A. Ma'am, that's when it started.
Q. Did a doctor tell you that the cause of the restless leg syndrome was stress?
A. Did a doctor?
Q. Yes, sir.
A. No, ma'am.

Q. All righty.
(Exhibit 6 marked)
Q. (By Ms. Phipps) Mr. King, you've been handed what's been marked as Exhibit 6 to your deposition, and it is a series of e-mails between -- from Ishmail Cruz and to who I believe is you. Are you mmgang893@yahoo?
A. Yes, ma'am.
Q. Okay. All right. As you take a look at Exhibit 6, do you -- just tell me first if you recall receiving and/or sending these e-mails.
A. (Witness reviews the document.) Yes, I do.
Q. Okay. So, the first one -- the first page of Exhibit 6 is an e-mail from Ishmail Cruz to you dated November 3rd, 2010, correct?
A. Yes, ma'am.
Q. And he's -- is he describing what the position would involve that you would be applying for?
A. Yes, he is.
Q. Does this accurately describe the position that you -- that you currently do?
MR. PECKHAM: Objection. Form. You can answer.
A. Actually, it does -- it does not.
Q. (By Ms. Phipps) Okay. And what -- in what way are your actual job duties different from what's

Q. Does it happen -- do you still suffer cramping sometimes after dialysis?
A. No.
Q. Okay. All right.
A. No. I've got my dialysis treatments -- I have learned a lot in two years about dialysis and how my body reacts to it.
Q. Are there any restrictions that Dr. Muniz or any of your other doctors have given you regarding the ability to work now?
A. The only restrictions they have given me is not to lift more than 30 pounds with my left hand, and that's it. That was the only restriction. And I need at least -- I need my three days a week and to be let off at 3:00 o'clock so I can get to the dialysis center.
Q. And other than the cramping, which you've described that you no longer suffer from, currently there are no side effects to the dialysis that you're aware of; is that right?
A. There's no -- that I'm aware of because I don't really -- I don't have any. I'm --
Q. All right.
A. I'm -- okay. I'm just like I said, I am just the -- I guess the exception to the rule.
(Exhibit 10 marked)

Q. (By Ms. Phipps) Okay. I've handed you what's been marked as Exhibit 10 to your deposition, which is -- appears to be your application to Equistar in 2003. When you have a chance to look through it, when you get to the last page, confirm that that's your signature and the date.
A. Yes, ma'am, it is my signature.
Q. Okay. And you were hired to be a machinery condition monitoring analyst; is that right?
A. Yes, ma'am.
Q. Is that the same thing as a vibration analyst?
A. Yes, ma'am.
Q. All right. So, that's the job you had at Equistar the entire time you worked there?
A. Yes, ma'am.
Q. And before Equistar was Equistar, you worked at Liondell, like, from 1998 to 2003?
A. Equistar was first, then we became Lion -- LyondellBasell -- Liondell, and then LyondellBasell.
Q. Okay. All right. So -- but when I refer to Equistar, I'm referring to LyondellBasell, the whole group of companies.
A. Yes.
Q. All right. And it's fair to say you never worked for Take Care, one of the defendants in this case. You

never worked for Take Care?
A. Take Care? No, I did not.
Q. Who did -- who did you report to in 2009 at Equistar?
A. In 2009?
Q. Yes, sir.
A. I'm trying to remember -- oh, I'm trying to remember his name.
Q. Oh, okay. Who did you work for in 2010?
A. In 2010 -- we went through three plant managers. We went through --
Q. Let me be more specific. Who was your direct supervisor in 2010?
A. In 2010?
Q. Yes.
A. Sorry.
MR. PECKHAM: The year of your termination.
A. The year of my termination was Keith.
Q. (By Ms. Phipps) Keith Hopkins?
A. Yes. I mean, Keith was my boss at that time, but before that I had another manager that was overseeing me. And I am sorry. I can't remember his name for the world of me.
Q. Would Keith Hopkins be the one to give you performance appraisals?

A. During that time?
Q. Yes.
A. In 2010?
Q. Yes, sir.
A. Yes.
Q. And it's fair to say that no one from Take Care gave you any performance appraisals?
A. For my job?
Q. Yes, sir.
A. For my abilities?
Q. They observed you doing your work and said you did a fine job, poor job?
A. Oh, no. No, they did not.
Q. And that would include Dr. Withers. Dr. Withers never came out to observe you do your job and give you a performance --
A. No, he did not.
Q. If you received a raise or a merit increase, you received that from Equistar; is that correct?
A. Yes.
Q. When you wanted to take vacation, would you submit that request to Keith Hopkins or someone else at Equistar?
A. Yes.
Q. Were you required to follow Equistar work rules

69

when you worked there in 2010?
A. Yes. Yes, ma'am.
Q. Now, Take Care operated the medical facility at some of the Llondell/Equistar facilities.
Would you have reason ever to interact with the Take Care staff prior to February 2010 when you went out on leave?
A. Could you --
Q. Did you ever have to --
A. -- rephrase it?
Q. Did you ever have to interact or visit with the Take Care medical staff prior to February of 2010?
A. I need to ask a question.
Q. Do you want me to explain what I'm asking?
A. I need to ask -- I don't know who Take Care is. I know that Dr. Withers is Take Care.
Q. Okay.
A. But I don't know if the other people that were in that office were all Take Care, which --
Q. Okay. I got you.
A. I don't think they were.
Q. Okay. You think -- all right. So, let me ask it this way.
Did you interact with Dr. Withers prior to March 2010 when you tried to return to work?

70

A. Prior to returning to work?
Q. Yes, sir.
A. Yes, I did.
Q. You interacted with Dr. Withers prior to March 2010?
A. I can't remember the exact date that I talked to him, but we talked one afternoon.
Q. Was this in regard to your returning to work?
A. Yes.
Q. Okay. So, I'm not talking about any incident related to your return to work in 2010. Before -- before this whole incident arose where you wanted to -- where you had to leave work on FMLA leave for a few weeks and then tried to return in 2010 -- I understand that you and Dr. Withers interacted then. But prior to that did you go see Dr. Withers because you had a cold or --
A. Oh, no. No, no.
Q. Okay. Did Mr. Withers ever tell you that he was your supervisor?
A. No.
Q. At the medical facility -- what plant did you work at for Equistar?
A. BCO.
Q. BCO?
A. Yes, ma'am.

71

Q. Were there signs -- Take Care signs in the medical facility?
A. Not that I can remember, no.
Q. Okay. All right.
MR. PECKHAM: Are you looking for a stopping point after an hour? Good.
VIDEOGRAPHER: Going off the record. It's 9:16 a.m.
(Recess from 9:16 a.m. to 9:27 a.m.)
VIDEOGRAPHER: We're now back on the record. The time is 9:27 a.m.
Q. (By Ms. Phipps) Okay. Now, while you worked at Equistar, you were aware that Equistar had an FMLA policy, correct, the family medical leave policy?
A. Yes, ma'am.
Q. All right. In fact, you produced one in the discovery of this case. They are all highlighted. Don't worry about that. But this is the document that you produced in the discovery of this case, so take a minute and tell me if you've seen this before.
(Exhibit 11 marked)
Q. (By Ms. Phipps) 11.
A. Yes, I have seen this before.
Q. Okay. Do you recall how many times you requested a leave of absence due to medical reasons while you worked

72

at Equistar?
A. Once. Yes, ma'am. One time.
Q. Once? You might be able to clear up some confusion for me. I'm going to hand you two exhibits. They are both requests for family or medical leave dated October 26, '09.
(Exhibit 12 marked)
(Exhibit 13 marked)
Q. (By Ms. Phipps) One of them, the first one, which is going to be Exhibit 12, has a return to work date of October 28th, '09, and Exhibit 13 has a pending return to work date. So, I'm going to show these to you and ask you to explain them.
A. Can I see them?
Q. She has to mark them first. Have you had a chance to look at them? This Exhibit 12 should have a return to work date that states 10/28/09.
Do you see that?
A. It says --
Q. Okay. Let's look at Exhibit 12.
A. Right here. Right here.
Q. Right.
A. Yes, ma'am.
Q. Well -- right. And it says "begin date" --
A. Uh-huh.

Q. -- October 26, '09. Do you see that?
A. Yes, ma'am.
Q. Yes? Okay. And then the return to work date says 10/28/309. Does that say that on your --
A. No, ma'am. It says return to work date pending.
Q. Okay.
MR. PECKHAM: Do we have them swapped?
A. No, 13 --
MR. PECKHAM: 12 has the 10/28 date and 13 has pending.
Q. (By Ms. Phipps) Okay. So, we're looking at 12.
A. I see -- yes, ma'am.
Q. All right. And that is your signature in the lower left corner?
A. Yes, ma'am.
Q. And it's actually dated 10/28/09. All right. Now, as I understood it, you did take time off in October related to your renal failure; is that right?
A. We -- what happened -- what happened here, I believe, is when I filled out my -- my FMLA like this, that I can remember, is Kimberly and I filled it out early.
Q. Kimberly Stubbs?
A. Yes.

Q. She was helping you fill out the paperwork?
A. Yes, ma'am.
Q. Okay. All right. And you filled -- and what was this particular leave for?
A. Every -- she said -- Kimberly and I -- what she said, we would just fill it out early for the -- for the renal stuff.
Q. Okay. So, you went to see Kimberly at some point?
A. Yes, ma'am.
Q. And you told her you needed to be out for surgery?
A. I told Kimberly I was -- I filled it out early because I was going in for renal failure.
Q. Was this when they were going to put the fistula in?
A. This probably was when they were going to put the -- no. 10/26/09.
Q. I'm going to hand you another --
MR. PECKHAM: Wait a second. I think he's trying to think his way through the dates.
A. 10/26/09. I know we filled out -- the family leave request out early. I know we did that because she said, "Well, why wait? Let's do it now," and that's why she filled it out and that's why I signed it. Now,

because -- this wasn't for the fistula because I got my fistula -- that was after the -- after the fact. I mean, that was, you know -- I can't -- I don't know the exact date when it -- I had my fistula put in.
Q. (By Ms. Phipps) Okay.
A. I mean, but that was -- that was after the Family Leave Act.
Q. All right. Okay. Let me go back.
A. I mean, you're --
Q. Let me -- I'm going to do it this way. You've been handed what's been marked as Exhibit 14 to your deposition, which is a certificate to return to work. It's from Dr. Khan.
Do you remember Dr. Khan?
A. Yes.
Q. And he was treating you for renal failure?
A. Yes, ma'am.
Q. And he says that you were under his care from October 17th to October 21st, '09.
Do you see that?
A. Yes, ma'am.
Q. All right. So, you were out of work for that period of time; is that right?
A. Yes, ma'am.
Q. All right. And he says you were able to return

to work on 10/28/09.
Do you see that?
(Exhibit 14 marked)
A. Return to work on 10/28 of '09, yes.
Q. (By Ms. Phipps) Do you remember if you took FMLA leave for this period of time you were off from October 17th to October 21st?
A. I'm sorry. I don't remember.
Q. Okay. Exhibit 15 is a medical disposition form which is dated October 28th of '09 which indicates you can return to work without restrictions signed by Kimberly Stubbs.
Do you see that?
A. Yes.
Q. Does this refresh your recollection at all as to your being out on family medical leave in October of '09?
(Exhibit 15 marked)
A. No. I'm sorry. I cannot remember the dates.
Q. (By Ms. Phipps) Okay. Is it fair to say that Kimberly Stubbs was helpful to you in applying for -- for family medical leave?
MR. PECKHAM: Objection. Form. Go ahead.
A. Yes.
MR. PECKHAM: I'm sorry. What was your answer?

77

A. Yes.
MR. PECKHAM: Thank you.
Q. (By Ms. Phipps) When you -- was Kimberly the only person you told that you needed to take family leave, or did you also tell Keith Hopkins?
A. My main contact was Kimberly on Family Leave Act. We filled out all the paperwork together.
Q. Did you tell your supervisor that you were going to have to be gone for a few weeks for some kind of medical procedure?
A. I would have to tell my supervisor any time I was leaving, ma'am.
Q. Okay. All right. But sitting here today, you don't actually recall that conversation. It was just your general practice to do that?
A. Yes, ma'am.
Q. Did anyone at Equistar say anything negative to you about taking family medical leave?
A. No, ma'am.
Q. Did anyone at Take Care say anything negative to you about taking family medical leave?
MR. PECKHAM: I'm just going to object to time frame.
Q. (By Ms. Phipps) Well, he said he only took it once. So, I'm going to say during the entire time

78

you worked at Equistar, did anyone at Take Care say anything to you about taking family medical leave?
A. As far as I can remember, no.
Q. Okay. The entire time you worked at Equistar, did anyone at Equistar say anything to you about taking family medical leave?
A. No, ma'am.
(Exhibit 16 marked)
Q. (By Ms. Phipps) I've handed you what's been marked as Exhibit 16 to your deposition, and it is the medical certification form signed by one of your doctors and also signed by you on the second page. If you would just confirm for me that that's your signature on the bottom of the second page.
A. Yes, ma'am.
Q. And it's dated February 17, 2010?
A. Yes, ma'am.
Q. All right. Do you know what -- what doctor signed this?
A. No. I can't tell by his handwriting, no, ma'am.
Q. Okay. I can't either. But anyway --
MR. PECKHAM: I can tell you who it is.
MS. PHIPPS: Well, no, because you're not testifying. Hold on.
Q. (By Ms. Phipps) Now, this says that you would be

79

in the hospital in February 2010 to have dialysis catheter placed to initiate dialysis, correct? Is that right?
A. Yes, ma'am.
Q. Okay. And that -- in Section 5 it says, "Patient will return to work on March 15, 2010. Patient will continue to" -- it says due, but "do dialysis three days a week."
Do you see that?
A. Yes, ma'am.
Q. All right. All right. So, do you know if this was provided to Kim Stubbs, Exhibit 16?
A. I don't know.
Q. All right. Did you -- you do recall going out on family medical leave to have this dialysis catheter placed?
A. Yes, ma'am.
Q. And was it this time, February 2010, that you discovered that you were -- you were diagnosed with end stage renal failure?
A. No.
Q. Okay. When were you diagnosed with end stage renal failure?
A. When they told me, I was going -- it was a few months beforehand.
Q. Before when?

80

A. Before February. I mean, yeah, it was a few months because I had -- I want to explain --
MR. PECKHAM: If you want to explain, either she can ask the question or I'll ask the question later.
Q. (By Ms. Phipps) Okay. How did you learn you had end stage renal failure?
A. I had learned -- well, through renal -- renal -- I forgot the name of the doctor's association -- renal specialist. They had told me a few months in advance that it looked like my kidneys were failing and --
Q. Was this Dr. Khan?
A. No. There's so many doctors here, ma'am. It was -- I can't remember. He's a -- he was one of the doctors -- the renal specialist in Pasadena, Texas -- in Pasadena that he told me that -- he looked at me and said, "Mr. King, it looks like your kidneys are failing. It's just a matter of time." And at that point in time, I knew. I mean --
Q. All right. So, when you went in for the catheter, the dialysis catheter as is described here --
A. Yes, ma'am.
Q. -- in Exhibit 16, you already knew you had end stage renal failure?
A. Oh, yes, ma'am.



Q. All right.
A. Can I provide one --
MR. PECKHAM: Answer her questions.
A. Yes, ma'am. I mean, yes, sir.
Q. (By Ms. Phipps) Was there some episode that triggered the analysis of your kidney? Did you have some sort of sickness, ill -- sickness -- acute sickness that caused you to have to go in for an examination?
A. Yes, ma'am.
Q. What was that?
A. I started swelling.
Q. Your body?
A. My legs.
Q. Your legs started swelling? Okay. And that was sometime, like, in 2009, the fall of 2009?
A. (Witness nods head affirmatively.)
Q. Is that a yes?
A. Yes, ma'am.
Q. Okay. All right. Now -- so, you go in, you have the -- whatever surgery you're going to have, and do you actually -- did you actually start dialysis while you were out on FML -- family medical leave?
A. Yes.
Q. Okay. All right. And you -- we understand that

you attempted to return to work -- return to work around March 150th, 2010.
Does that sound right to you?
A. That sounds right to me, yes.
Q. Okay. What did you do in order to facilitate your return to work? Who did you talk to at Liondell or Take Care in order to come back to work?
A. Best I can remember is I had a return to work slip. I had -- I believe I -- I believe I went to Kimberly first and -- and -- and at that time things got a little -- it was like, "Yes, you can. Here's my return to work slip." And it was, "No, you cannot return to work."
Q. That's what Kimberly told you?
A. I believe it come down from somebody higher above.
Q. Okay. So, you went to see Kimberly and you handed her your return to work slip?
A. Uh-huh. (Witness nods head affirmatively.)
Q. Is that right?
A. I believe so.
Q. Okay. And then how was it -- how long was it before you discovered that Kimberly was saying you couldn't come back to work right then? Was that the same day?
A. Same day.

Q. All right. Did you talk to anyone at Equistar about your return to work that same day?
A. No. I don't think I did. But if you have something to document anything to refresh my memory, I would be gladly --
Q. No, I don't. I was just going --
A. Because I -- I was -- that day was -- that was just a bad day for me.
Q. Uh-huh. Well, was Kimberly mean to you?
A. No. It wasn't that she was mean. It was that I was upset about them saying no.
Q. Okay. Did she tell you why you couldn't return to work that day?
A. No.
Q. Okay. All right. So, what did you do after Kimberly said you couldn't return to work? What did you do about trying to get back to work after that?
A. Well, I requested to talk with Dr. Withers to find out why.
Q. Okay.
A. Because I wanted to know the whole picture and -- go ahead. I'm sorry.
Q. Okay. Did Kimberly tell you Dr. Withers was saying that you weren't approved to return to work yet?
A. I believe -- yes.

Q. Okay. So, did you get a chance to talk to Dr. Withers?
A. Yes, I did.
Q. Do you remember about when?
A. No, I don't remember the -- the exact date.
Q. Okay. Was it within March?
A. I need to know that date, the return to work date. It was somewhere within that month.
Q. Okay. Did you talk to Dr. Withers in person?
A. Yes.
Q. So, at this point the only persons you've talked to about returning to work are Kimberly Stubbs and Dr. Withers?
A. That I can remember, yes.
Q. And did you go to doctor -- to the medical office at the BCO facility?
A. Yes.
Q. All right. And was anyone else in the room with you and Dr. Withers when you spoke?
A. No.
Q. Okay. And what did Dr. Withers tell you about your ability to return to work at that time?
A. Dr. Withers, he didn't -- we didn't talk about -- I asked why, and Dr. Withers handed me a document about transportation and aviation and there was an article in

A. I'm sorry. I'm reading out to myself.
Q. Did you hear my question?
A. Yes, ma'am, I heard your question. I -- I dis -- well, I disagree with "occasional."
Q. Okay. How would you describe it? Let's take the first box.
A. The first box?
Q. Yes, where it says "Walking, climbing -- climbing, walking on elevator platforms, carrying tools, grasping, reaching, maneuvering, and working in tight places, repetitive hand/arm tasks, kneeling, squatting."
A. Every day.
Q. Every day? Okay. All right. The second box, "Must be able to perform unit inspections of rotating machinery systems to include, but would not be limited to" -- again, climbing, manipulation of various hoses, grasping, reaching at various heights, taking readings of pressure, temperature, vibration. I'm not going to read it all, but --
A. Right. Yes, ma'am. I -- this was almost an everyday task.
Q. So, it would be more than occasional?
A. It would be more than occasional.
Q. Okay. Would you say if you worked -- did you all work 10-hour days or 8-hour days?



A. 10-hour days. Four 10s.
Q. Would you spend at least five hours a day on the items in the first block and --
MR. PECKHAM: Objection. Form.
A. I would say -- I'm trying to remember how long we were out. Yes, I would say five hours. Yeah, five hours a day easily.
Q. (By Ms. Phipps) Okay. And what about in the second box which starts, "Must be able to perform routine unit inspections"? How -- what -- how many hours a day would you perform those tasks?
A. Well, it's performing vibration routes. Vibration routes are every day.
Q. And how much -- what percentage of your day would you spend on that?
A. Half a day or more. Depending on --
Q. Okay. So, that's five hours?
A. Yes, ma'am, depending on what's happening out in the field. It could sometimes be up to a 16-hour day or more.
Q. Okay. And then it says, "Must be able to perform computer tasks to include e-mail correspondence."
How much of your day would you spend on that?
A. Well, after every day I would come in, I would



download. I could say, you know, four hours or more -- four or five. I mean, I would work it out where I can work -- I do my routes, I download, which will take -- you know, it could be four hours, three hours a day. And then some -- and then the next day it could be -- when I'm analyzing all the data and doing reports, it could be most of the day.
Q. Okay. So, which of these -- strike that.
As I understand it, you were the only condition monitoring analyst at the BCO facility?
A. Yes, ma'am.
Q. All right. So, does that mean you worked most of the day alone?
A. Yes, ma'am.
Q. All righty. Would you have to work around hot equipment --
A. Yes, ma'am.
Q. -- that could burn you if you touched it?
A. Yes, ma'am.
Q. Okay. Would you have to maneuver and work in tight places?
A. Yes, ma'am.
Q. Would you typically get a break during the day?
A. Yes, ma'am.
Q. You would? How long a break would you get?



A. We get three breaks a day.
Q. Three?
A. Yes, ma'am. We got one at 9:00, one at lunch, and then around 2:00 o'clock or 3:00.
Q. Were the 9:00 and 3:00 o'clock breaks 15-minute breaks?
A. 15-minute breaks.
Q. And how long did you get for lunch?
A. Half an hour.
Q. Okay. And you would have to be available after hours for emergency response?
A. Yes, ma'am.
Q. Exactly what would you do in an emergency? What would be your role?
A. Emergency response would mean any piece of equipment that they thought had a problem, I would go out there and analyze the problem for them.
Q. Oh, okay.
A. It would take anywhere from being there -- it could be there 10 minutes finding out an operator didn't start up a piece of equipment correctly and I would show them how to start it up, or it could take all -- all day or all night or the next day.
Q. How frequently would you actually have to go out in these after-hour emergency responses?

A. How frequently?
Q. Yes, sir.
A. I could say -- that's a very good question.
Q. More than once a week?
A. Maybe once a week, maybe -- and sometimes it could be two or three times a night or a day. It's a chemical plant is what I have to say to that. Whenever they need me, that's when I come.
Q. And there was no backup for you?
A. I did have backups, but they were at other facilities and I would have to call them and say, you know, "Hey, I need help" or, "Hey, I've been out here all night." And I could either call straight to them or -- I didn't even have to go through Keith on that.
Q. Okay.
A. I just had to -- I would call up to La Porte and say, "Hey, I need -- need you."
Q. Did you ever actually see the recommendation Dr. Withers prepared for Equistar with regards to your returning to your job?
A. Not until after -- way after we talked.
Q. Okay. You mean long after you and Dr. Withers talked?
A. Yes. That was after they let me go.
Q. Okay. You mean you saw the restrictions after

you were let go?
A. Way after -- way after I was let go.
Q. Do you remember when?
A. The exact date, no, but I know it was -- it was after all that was -- after all was said and was done, then I finally got a copy of the restrictions.
Q. Okay. Did you ask anyone for a copy of the restrictions?
A. Yes, many times.
Q. Who did you ask?
A. I asked Kimberly, I asked Dr. Withers, I asked HR. I believe that covers it, but -- I mean, it didn't happen until after, you know, I was let go. I was -- because I wanted to know why. I wanted to know what the restrictions -- they were letting me go because of Dr. Withers' restrictions. What are the restrictions? No one could tell me.
Q. So, you couldn't show the restrictions to Dr. Muniz; is that right?
A. I think that -- the restrictions were sent to Dr. Muniz.
Q. And he didn't show them to you either?
A. Dr. -- yes.
Q. Dr. Muniz showed them to you?
A. That was after. I mean --

Q. After you were terminated?
A. Yes. That was after after.
Q. Before you were terminated, did you see the restrictions?
A. No.
Q. All right. Before you were terminated did you have a chance to just -- well, let me just state it like this.
So, you didn't have a chance to discuss the restrictions with Dr. Muniz before you were terminated; is that right?
A. No. It was after. Everything happened after.
Q. I just need to make sure the question is clear, that you and Dr. Muniz did not discuss the exact restrictions recommended by Dr. Withers until after you were terminated; is that right?
A. Yes.
Q. Okay.
(Exhibit 18 marked)
Q. (By Ms. Phipps) All right. Exhibit 18 is the e-mail Dr. Withers sent to the folks at Equistar and some other people at Take Care regarding the restrictions he was recommending for your continuing to work, okay? The first one is not to work alone in environments where sudden incapacitation or loss of situational awareness

would result in a high risk of traumatic or burn injury.
Do you see that?
A. Yes.
Q. Would that restriction have interfered with your returning to your job as a vibration analyst?
MR. PECKHAM: Objection. Form.
A. Not to work around environments --
Q. (By Ms. Phipps) Could you have -- could you have done your job if you had someone to work with you?
MR. PECKHAM: Objection. Form.
A. I could do my job without anybody with me.
Q. (By Ms. Phipps) Right. If someone -- was there someone available to be with you if you needed someone there?
A. At the facility at that time?
Q. Yes, yes.
A. For me to do my -- with this restriction?
Q. Yes, sir.
A. There was no one else at the facility to help me if --
MR. PECKHAM: Wait, wait, wait. He was not finished. If --
A. If -- okay. There was no one else at the facility, but there is nobody else at the facility.

201

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MATTHEW KING )
)
vs. )CASE NO. 4:12-cv-00341
)
EQUISTAR CHEMICALS, L.P., )
LYONDELLBASELL INDUSTRIES, )
N.V., a/k/a LYONDELBASSEL, )
BENJAMIN FRANKLIN WITHERS, )
III, M.D., AND TAKE CARE )
HEALTH SYSTEMS )

REPORTER'S CERTIFICATE
ORAL VIDEOTAPED DEPOSITION OF MATTHEW KING
October 3, 2012

I, Shauna Foreman, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MATTHEW KING, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to Victoria Phipps.

That a copy of this certificate was served on all parties and/or the witness shown herein on ________________.

I further certify that pursuant to FRCP Rule

202

30(f)(1), the signature of the deponent:

____was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days (or _____ days, per agreement of counsel) from date of receipt of the transcript. If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

____was not requested by the deponent or a party before the completion of the deposition;

I further certify that I am neither counsel for, related to, nor employed by any parties or attorneys in the action in which this testimony is taken, and further that I am not financially or otherwise interested in the outcome of this action.

Certified to by me on this the 4th day of October, 2012.

Shauna Foreman
Shauna Foreman, CSR
Texas CSR 3786
Expiration: 12/31/2012
Esquire Deposition Solutions
1001 McKinney, Suite 805
Houston, Texas 77002
Tel. (713)524-4600
Firm No. 03

203

COUNTY OF HARRIS )
STATE OF TEXAS )

I hereby certify that the witness was notified on ______________ that the witness has 30 days (or ______ days, per agreement of counsel) after being notified by the officer that the transcript is available for review by the witness and if there are changes in the form or substance to be made, then the witness shall sign a statement reciting such changes and the reasons given by the witness for making them;

That the witness' signature was/was not returned as of ______________________, 2012.

Subscribed and sworn to on this the _____ day of __________________, 2012.

Shauna Foreman, CSR
Texas CSR 3786
Expiration: 12/31/2012
Esquire Deposition Solutions
1001 McKinney, Suite 805
Houston, Texas 77002
Tel. (713)524-4600
Firm No. 03