# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MATTHEW KING                    )
                                )
vs.                             )    CIVIL ACTION
                                )    4:12-cv-00341
EQUISTAR CHEMICALS,LP;          )
LYONDELLBASELL INDUSTRIES       )
N.V. A/K/A LYONDELLBASELL;      )
BENJAMIN FRANKLIN WITHERS       )
III, M.D. AND TAKE CARE         )
HEALTH SYSTEMS, LLC             )

ORAL DEPOSITION

HENRY MUNIZ, M.D.

JANUARY 15, 2013


        ORAL DEPOSITION OF HENRY MUNIZ, M.D., produced as a

witness at the instance of the Defendants Benjamin

Franklin Withers, III, M.D. and Take Care Health

Systems, LLC, and duly sworn, was taken in the

above-styled and numbered cause on the 15th day of

January, 2013, from 10:10 a.m. to 1:30 p.m., before C.

Lee Parks, Certified Shorthand Reporter in and for the

State of Texas, reported by computerized stenotype

machine at the offices of Renal Specialists of Houston,

PA,8876 Gulf Freeway, Suite 215, Houston, Texas 77017,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

1                          APPEARANCES

2     FOR PLAINTIFF:

3          Ms. Mary A. Martin, Esquire
           Charles H. Peckham, Esquire
4          Two Bering Park
           800 Bering Drive, Suite 220
5          Houston, Texas 77057
           Telephone:  (713) 574-9044
6          Fax:  (713) 493-2255
           E-mail:  mmartin@peckhampllc.com

7

      FOR DEFENDANTS EQUISTAR CHEMICALS, LP; LYONDELLBASELL
8     INDUSTRIES N.V. A/K/A LYONDELLBASELL:

9          Ms. Anita Barksdale, Esquire
           Jackson Walker
10         1401 McKinney Street, Suite 1900
           Houston, Texas 77010
11         Telephone:  (713) 752-4423
           Fax:  (713) 308-4134
12         E-mail:  abarksdale@jw.com

13    FOR DEFENDANTS BENJAMIN FRANKLIN WITHERS III, M.D. AND
      TAKE CARE HEALTH SYSTEMS, LLC:
14
           Ms. Victoria M. Phipps, Esquire
15         Ms. Nehal R. Shah, Esquire
           1301 McKinney Street, Suite 1900
16         Houston, Texas 77010-3031
           Telephone:  (713) 652-4708
17         Fax:  (713) 951-9212
           E-mail:  vphipps@littler.com
18
      ALSO PRESENT:  Benjamin Franklin Withers, III, M.D.
19
      COURT REPORTER:  C. Lee Parks
20                     Certified Shorthand Reporter
                       Certificate No. 1235
21                     Expiration:  12-31-2013
                       Esquire Deposition Solutions
22                     Firm Registration No. 03
                       1001 McKinney Street
23                     Suite 805
                       Houston, Texas 77002
24                     Telephone:  (713) 524-4600

25

1                      INDEX

2   MUNIZ                                PAGE

3   Examination by Ms. Phipps............................4

4   Examination by Ms. Barksdale........................84

5   Examination by Ms. Martin...........................99

6   Further Examination by Ms. Phipps..................128

7   Further Examination by Ms. Barksdale...............133

8   Further Examination by Ms. Martin..................135

9   Witness Corrections/Signature......................137

10  Reporter's Certification...........................139

11                   EXHIBITS

12  MUNIZ                               PAGE

13  Exhibit No. 58.......................................4

14  Exhibit No. 59......................................10

15  Exhibit No. 60......................................10

16  Exhibit No. 61......................................12

17  Exhibit No. 62......................................19

18  Duplicate Exhibit No. 62............................65
    (Duplicate Exhibit No. 62 re-marked as No. 65 later.)
19  Exhibit No. 63......................................76

20  Exhibit No. 64......................................78

21  Exhibit No. 65......................................82
    (Duplicate Exhibit No. 62 re-marked as No. 65)

22

23

24

25

1    HENRY MUNIZ, M.D.,

2    having been first duly sworn, testified as follows:

3    EXAMINATION

4    Q.    (BY MS. PHIPPS)  Dr. Muniz, my name is Vicky

5    Phipps and I'm the attorney that represents the

6    Defendants Take -- Take Care and Dr. Withers in this

7    litigation.  You understand that I do not represent

8    Mr. King?

9    A.    Yes.

10    Q.    All right.  And you're here on behalf of Mr.

11    King as his expert testifying witness?

12    A.    Correct.

13    Q.    All right.  One of the documents that I'm going

14    to introduce into evidence, I want to -- and as a -- as

15    a exhibit to this -- Excuse me -- deposition is the

16    Subpoena Duces Tecum which was the Notice of Deposition

17    and the documents we requested.

18    MS. PHIPPS:  And I'm just going to have

19    you go ahead and mark this as Exhibit 58.

20    (Exhibit Muniz No. 58 marked)

21    Q.    Were you given -- provided a copy of the Notice

22    of Deposition and the Subpoena Duces Tecum?

23    A.    Yes.

24    Q.    Okay.  I'm just going to go over some of the

25    documents that you've produced today so I know what's

1    limited knowledge about exactly what Mr. King does or

2    what he did as a Vibrations Tech Analyst, correct?

3         A.   I have talked to him and I know how much

4    exercise he can do, how much he can or how much he

5    cannot do.

6              MS. PHIPPS:   I'm going object to the

7    responsiveness.

8         Q.   I'm talking about the specifics of his job as a

9    Vibrations Tech Analyst.  How familiar are you with that

10   job?

11        A.   No, I have no familiarity with that.  I'm just

12   familiar from the history that I took from him how

13   physically -- what physically he can and cannot do.

14        Q.   Okay.  Okay.  All right.  So I'm going to move

15   on.  I'm going to come back to Exhibit 1 -- I mean,

16   Exhibit 62 later and go through the rest of my

17   questions.  As a nephrologist you specialize in treating

18   kidney disorders; is that right?

19        A.   Uh-huh.  Yes.

20        Q.   All right.  And that includes a specialization

21   in the area of dialysis, correct?

22        A.   Correct.

23        Q.   Could you explain to the jury what dialysis is?

24        A.   Well, what it is is that when a patient has

25   kidney failure, that means the kidneys are not working.

1    The job of the kidney is to clean the blood.  If -- When

2    you have a patient that has kidney failure you cannot

3    get rid of the poisons.  So anything they eat

4    accumulates in their blood and it causes all kinds of

5    symptoms.  Dialysis, what you do with dialysis is you

6    remove the blood a little bit at a time out of the body,

7    goes through the kidney, it gets clean, and them we give

8    it back to the patient.

9         Q.   All right.  So you would consider yourself an

10   expert in nephrology?

11        A.   Yes.

12        Q.   All right.  But you've not specialized in

13   visiting work sites to develop measures by which an

14   employee is -- is protected from hazards at work?

15        A.   No, I have not done that.

16        Q.   All right.  You don't normally perform

17   walk-throughs of facilities like the -- the Lyondell

18   plant to analyze what risks the workers there might

19   face, correct?

20        A.   Correct.  I've never done that.

21        Q.   All right.  And you don't normally make

22   appointments with your patients' supervisors to

23   determine the exact physical requirements of the jobs

24   that your patients hold, correct?

25        A.   I just go by what the patients tell me.

Page 35

1    nurse --

2         Q.    Uh-huh.

3         A.    -- the head nurse at DaVita.  Because I know

4    that Dr. Withers called and said, you know, can he go

5    back to work?  And I said yes, there needs to be a

6    30-pound restriction because he had a new fistula and

7    I -- that was being developed.  He had a catheter that

8    can only be temporarily used for a while and then we

9    have to go with the fistula.  But he had a fistula.  So

10   I think I put a 30-pound restriction on him to go back

11   to work.  I didn't want him to lift more than 30 pounds.

12        Q.    And that was a restriction you -- you gave

13   verbally to Dr. Withers?

14        A.    I gave it verbally to Deena, who I think sent

15   the information to Dr. Withers.  That's what I recall

16   now.

17        Q.    You think she sent something in writing to

18   Dr. Withers?

19        A.    I think there's something.  Deena sent a letter

20   saying that he has -- There was some writing somewhere.

21        Q.    That he could --

22        A.    I remember -- That I remember, it was -- was

23   given to Dr. Withers.

24        Q.    All right.

25        A.    I think it's in the records somewhere if I

1    recall correctly.

2         Q.    Was -- Does Deena work with DaVita --

3         A.    Yes.

4         Q.    -- or was --

5         A.    Yes.

6              MS. PHIPPS:   Let's go off the record.

7              (Discussion off the record.)

8         Q.    I don't see any letter like that.  Dr. Muniz,

9    we need some -- Looking back at Exhibit 30 --

10        A.    Uh-huh.

11        Q.    -- it does not include any restrictions other

12   than a need to have dialysis three days a week for the

13   rest of the patient's life or until patient gets a

14   kidney transplant.  Do you see that?

15        A.    Right.

16        Q.    All right.

17        A.    But again, I didn't sign this.

18        Q.    Right.  And you -- you can't tell who did sign

19   it.  Who are the people who could've signed it in your

20   office who are also nephrologists?

21        A.    I would say probably Dr. Coca or Dr. Uyeda.

22        Q.    A Dr. who?

23        A.    Uyeda.

24        Q.    How do you spell that?

25        A.    U-y-e-d-a.  Or Dr. Koka, K-o-k-a.

1    for -- for -- for patients that are in dialysis as

2    opposed to people who have normal kidney function?

3              MS. MARTIN:  Objection, form.

4        A.    That's not what I said.

5        Q.    Okay.  So the risk is higher for people who

6    have --

7        A.    Yes.

8        Q.    -- who are in dialysis --

9        A.    Yes.

10       Q.    -- correct?

11       A.    Yes.

12       Q.    We know Mr. King was a diabetic and had end

13   stage renal disease and was -- had hypertension,

14   correct?

15       A.    Correct.

16       Q.    Assume with me that Mr. King worked in the

17   heat; that he had to wear the heavy PPE, that he worked

18   in tight spaces and that he worked by himself.  Given

19   those assumptions, was it unreasonable for Dr. Withers

20   to recommend that Mr. King not work alone?

21             MS. MARTIN:  Objection, form.

22       A.    That's not unreasonable.

23       Q.    Okay.  Now, are you aware that at least as of

24   the time Mr. King gave his deposition earlier in 2012 --

25       A.    Uh-huh.

1      A.   Yes, I remember that.

2      Q.   And I -- They asked you on the second page to

3   look at his psychological functions.  Do you see that on

4   the second page at the very top?

5      A.   Okay.

6      Q.   It says:  Check applicable box below.  And you

7   checked Class 1 - Patient is able to function under

8   stress and engage in interpersonal relations.  You put:

9   (No limitations).  Do you see that?

10     A.   Psychological, yes, correct.

11     Q.   Correct.  And then physical capability, you

12   have him -- I don't see that you checked off any

13   physical limitations.  Did you?

14     A.   No.

15     Q.   Okay.

16     A.   No, I did.  No, I did.

17     Q.   Which ones?

18     A.   Fifty-one to a hundred pounds.

19     Q.   And so is he going frequently with 51 to a

20   hundred pounds?

21     A.   And up to 10 pounds, 20 pounds, 21 to

22   continuously up to 50 pounds --

23     Q.   Right.

24     A.   -- 67 to a hundred percent of the time.

25     Q.   And you indicated he could work a total of ten

1    hours per day?

2         A.    Yes.

3         Q.    And then on the cardiac it says -- you put

4    Class 1 (No Limitation)?

5         A.    Correct.

6         Q.    Did you do that primarily based on the history

7    that he had given you?

8         A.    Right.  He told me that he could -- he could

9    walk at least two to three flights of stairs.  That

10   translates to at least ten mets and he had no symptom

11   after he did that.

12        Q.    Uh-huh.

13        A.    That's probably as much as I can do.

14        Q.    Uh-huh.

15        A.    And I don't have dialysis.  So I think that's

16   pretty darn good --

17        Q.    Is it --

18        A.    -- for dialysis patients.

19        Q.    I'm sorry to interrupt you.  Is it ever

20   advisable to test what the patient is telling you to see

21   if -- if there's --

22        A.    Yes, if --

23        Q.    -- some confirmation?

24        A.    Yes.  If he tells me that he can -- he can walk

25   two flights of stairs and that he gets chest pain, yes,

1    I asked him if he had any symptoms at the end of the two

2    flights of stairs.  He said no, he didn't get terribly

3    short of breath, he didn't get any chest pain, he didn't

4    get dizzy; things like that.

5         Q.   And do you remember the last time before this

6    lawsuit that you had a discussion with him about his

7    job?

8         A.   You mean when?

9         Q.   When.

10        A.   Well, I can't recall when.  But I had

11   discussions with him.

12             MS. BARKSDALE:  Okay.  I'll pass the

13   witness.

14                      EXAMINATION

15        Q.   (BY MS. MARTIN)  Let me have you look at

16   Exhibit 17 first.  Dr. Muniz, I'm going to show you

17   what's previously been marked as Exhibit 17 in this

18   litigation.  Would you take a minute to look at it?

19   Have you seen this before?

20        A.   Yes, I think I have.

21        Q.   All right.  At the top of it, it says that this

22   is a Job Site Analysis.  Do you see that?  It's a little

23   bit cut off.

24        A.   Yes.

25        Q.   Okay.  And for -- The company is Lyondell,

1    correct?

2        A.    Yes.

3        Q.    And the location is Bayport, correct?

4        A.    Correct.

5        Q.    Okay.  And the job title is Condition

6    Monitoring Analyst.  Do you see that?

7        A.    Yes.

8        Q.    Do you know what Matt King's position was?

9        A.    He was a Vibration Tech.

10       Q.    All right.  Do you know if that is the same as

11   a Condition Monitoring Analyst?

12       A.    I don't.

13       Q.    Okay.  When you look at this Job Title for

14   Condition Monitoring Analyst, you see at the -- about

15   the third level down it says:  Essential Function,

16   correct?

17       A.    Yes.

18       Q.    Okay.  Tell me what that says following that.

19       A.    The following duties are considered essential

20   functions for this job in which the employee must be

21   able to perform.

22       Q.    Okay.  Assume with me that this is the Job Site

23   Analysis and the Essential Function sheet for Matt

24   King's position.  Okay?

25       A.    Uh-huh.

1       Q.    Look at that.  Let's start with Job Task and

2    frequency.  Under Job Task you see it must be able to

3    perform field inspection of rotating equipment.  This

4    task may include but is not limited to.  The first --

5    The point is walking various distances.  And the

6    frequency says:  Occasional to frequent depending on

7    task.  Do you see that?

8       A.    Yes.

9       Q.    Okay.  In your opinion, was Matt King able at

10   the time in 2010 when you saw him to walk various

11   distances occasionally --

12      A.    Yes.

13      Q.    -- to frequently?

14      A.    Yes.  He can do that.

15      Q.    What about the second part:  Climbing ladders

16   and stairs up to 80 feet?

17      A.    Now, 80 feet is how many flight of stairs?

18      Q.    I -- You know, I don't have an answer to that.

19      A.    I think he can climb up to two flights of

20   stairs.

21      Q.    All right.  And what about ladders?

22      A.    I think he can do ladders.

23      Q.    Okay.  And let's -- let's talk for a second --

24   I'm going to get a little bit off course from there.

25   Exhibit 49 that we looked at earlier, if you'll refer to

1    it again, No. 2, this is the email from Dr. Withers.

2    And No. 2 under restrictions, he says:  Not to work at

3    unprotected heights.  Are you familiar with OSHA

4    regulations, Dr. Muniz?

5         A.    No, I'm not.

6         Q.    Okay.  Do you know from what you know generally

7    whether or not working in unprotected heights in any

8    kind of job environment is restricted for most people?

9              MS. MARTIN:  Object to speculation.

10             MS. BARKSDALE:  Objection, speculation.

11        A.    I don't.

12        Q.    Let's go back to Exhibit 17 then:  Climbing and

13   walking on elevated platforms.  In your opinion, was

14   Matt King able since 2010 to work, climb and walk on

15   elevated platforms?

16        A.    He can go up to two flights of stairs.

17        Q.    Next job task is carrying tools (Approximately

18   up to 10 pounds).  Was Matt King, in your opinion, able

19   to carry tools up to ten pounds in 2010?

20        A.    Yes.

21        Q.    Grasping is the next subpart.  In your opinion,

22   was Matt King in 2010 able to grasp?

23        A.    Yes.

24        Q.    Okay.  Next is Reaching.  In your opinion in

25   2010, was Matt King able to reach?

1      A.    Yes.

2      Q.    The next subpart is Maneuvering and working in

3  tight places.  In your opinion in 2010, was Matt King

4  able to maneuver and work in tight places?

5      A.    Yes.

6      Q.    Next is Repetitive hand/arm tasks.  In your

7  opinion, was Matt King in 2010 able to do repetitive

8  hand/arm tasks?

9      A.    Yes.

10     Q.    Next is Bending, kneeling, squatting and

11  standing.  In your opinion in 2010, was Matt King able

12  to bend, kneel, squat and stand?

13     A.    Yes.

14     Q.    And the final portion under there is Fine Motor

15  dexterity.  In your opinion in 2010, did Matt King have

16  fine motor dexterity?

17     A.    Yes.

18     Q.    The next portion of that says:  Must be able to

19  perform routine unit inspection systems to include but

20  would not be limited to:  And it says:  This task may

21  include but is not limited to:

22              Do you see where that says that?

23     A.    Yes.

24     Q.    Okay.  And again, assuming that this Job Site

25  Analysis applies to Matthew king, in your opinion, in

1    2010, could Matthew King climb up to 20 to 100 feet?

2        A.   Yes.  As long as that represents two to three

3    flights of stairs, I'm okay with that.

4        Q.   So if it's the equivalent of two to three

5    flights of stairs, in your opinion Matt King was able to

6    do that in 2010?

7        A.   Yes.

8        Q.   Okay.  Bending, squatting and kneeling is there

9    again.  And I think we've already been through this, but

10   in your opinion in 2010, was Matt King able to bend,

11   squat and kneel?

12       A.   Yes.

13       Q.   The next subpart is Carrying small equipment or

14   hand tools.  In your opinion in 2010, was Matt King able

15   to carry small equipment or hand tools?

16       A.   Yes.

17       Q.   The next portion is Grasping and reaching at

18   various heights.  In your opinion in 2010, was Matt King

19   able to grasp and reach at various heights?

20       A.   Yes.

21       Q.   The next sub-portion is Manipulation of a

22   variety of hoses.  In your opinion in 2010, was Matt

23   King able to manipulate a variety of hoses?

24       A.   Yes.

25       Q.   The next portion of this is Take readings

1   (pressure, temperature, vibration) up to 2 times or more

2   per shift.  In your opinion in 2010, was Matt King able

3   to take readings, putting pressure, temperature and

4   vibration up to two times or more per shift?

5        A.   Yes.

6        Q.   All right.  Then it says underneath there:

7   This task may include but is not limited to:

8             Do you see that portion?

9        A.   Yes.

10       Q.   And it says Climbing.  In your opinion, was

11  Matt King in 2010 able to climb?

12       A.   Yes, two to three flights of stairs.

13       Q.   Okay.  Next is Visual focusing.  In your

14  opinion in 2010, was Matt King able to visually focus?

15       A.   Yes.

16       Q.   The next portion is Bending, squatting and

17  kneeling.  Again, in your opinion in 2010, was Matt King

18  able to bend, squat and kneel?

19       A.   Yes.

20       Q.   The next portion under there says:  Must be

21  able to perform computer tasks to include e-mail

22  correspondence training and other assigned tasks up to

23  0-4 hours per week (sic), says Occasional.  Do you see

24  where it says that?

25       A.   Yes.

1      Q.   In your opinion in 2010, was Matt King able to

2   perform computer tasks to include e-mail correspondence

3   training and other assigned tasks up to zero to four

4   hours for day -- per day?

5      A.   Yes.

6      Q.   The next portion of this says:  Must be able to

7   respond to emergency technical support requests on

8   non-routine hours in order to support the daily

9   operation of the process unit.

10           Do you see where it says that?

11     A.   Yes.

12     Q.   In your opinion, was Matt King able to respond

13  to emergency technical support requests on non-routine

14  hours in order to support the daily operation of the

15  process unit?

16     A.   Yes.

17     Q.   Okay.  Let's go down to where there's a portion

18  that says:  Physical Demands.

19           Do you see where it says that?

20     A.   Yes.

21     Q.   The first under -- section under Physical

22  Demands is lift -- lifting of weights.  Do you see where

23  it says that?

24     A.   Uh-huh.  Yes.

25     Q.   Now, next to it you'll see Frequency.  And it

1    says F, O and N.  And if you go back, let's go one more

2    page behind and it'll tell you that frequency, N is

3    Never, zero percent; O is Occasional, 1 to 33 percent; F

4    is Frequent, 33 to 66 percent, and C is Constant, 66 to

5    a hundred percent.  Do you see where it says that?

6         A.   I got it, yes.

7         Q.   Okay.  So you understand that when you look at

8    what is listed in the inspection of under Frequency, the

9    F, N, O designations correspond with those --

10        A.   Yes.

11        Q.   -- requirements?  So let's talk about lifting

12   weights.  It's says:  Under this job description,

13   lifting weights, zero to ten pounds occurs frequently

14   for tools and equipment to various heights.

15             In 2010, your opinion in 2010, was Matt

16   King able to lift weights of zero to ten pounds

17   frequently?

18        A.   Yes.

19        Q.   The next section is 11 to 20 pounds.  And again

20   it's designated as frequent for tools and equipment to

21   various heights.  In your opinion in 2010, was Matt King

22   able to lift 11 to 20 pounds frequently?

23        A.   Yes.

24        Q.   The next section is 21 to 50 pounds and it says

25   in there as Occasional for tools and equipment to

1  various heights.  In your opinion in 2010, was Matt King

2  able to lift weights of 21 to 50 pounds occasionally of

3  tools and equipment to various heights?

4     A.   Yes.

5     Q.   And the next section is 50 to 100 pounds and

6  the designation is Never.  Is that correct?

7     A.   Correct.

8     Q.   Okay.  And in accordance with the restrictions

9  that you put on Matt King was -- which were not to lift

10 more than 50 pounds under this lifting of weights, there

11 is no requirement for that; is that correct?

12    A.   That's correct.

13    Q.   Okay.  The next portion is Carrying weights.

14 And we'll go through that as well.  It is zero to ten

15 pounds.  It says frequency is frequent and it's for

16 tools and equipment to various distances.

17          Do you see where it says that?

18    A.   Yes.

19    Q.   In your opinion in 2010, was Matt King able to

20 carry zero to ten pounds frequently with tools and

21 equipment to various places?

22    A.   Yes.

23    Q.   Next section is 11 to 20 pounds.  In your

24 opinion in 2010, was Matt king able to go carry weights

25 of 11 to 20 pounds frequently with tools and equipment

1    to various distances?

2        A.    Yes.

3        Q.    The next carrying of weights is 21 to 50

4    pounds.   The designation is Occasionally.  And it's

5    tools and equipments to various distances.  Do you see

6    where it says that?

7        A.    Yes.

8        Q.    In your opinion in 2010, was Matt King able to

9    carry weights of 21 to 50 pounds occasionally for tools

10   and equipment to various distances?

11       A.    Yes.

12       Q.    The final designation under carry of weights is

13   50 to 100 pounds.  And it says:  Never.  Is that

14   correct?

15       A.    That's correct.

16       Q.    And in accordance with the restrictions you put

17   on Matt King to return to work, you were -- you also had

18   a restrictions that he could not carry more than 50

19   pounds, correct?

20       A.    Correct.

21       Q.    The next section is Push force.  And it has

22   again this --

23              MS. PHIPPS:  Did you say 50 or 30 pounds?

24              MS. MARTIN:  It's 50.

25              MS. PHIPPS:  I thought the restriction was

1    30.

2                    MR. PECKHAM:  Less.

3                    MS. MARTIN:  Okay.  We'll get there.

4        Q.    Next -- Next section is Push force.  And it

5    says -- Do you know what push force is?

6        A.    You push on things.

7        Q.    Okay.  It says zero to ten.  And it says:

8    Frequency is frequent, to use or manipulate hand tools,

9    equipment and valves at various heights.  In your

10   opinion, was Matt King able to push force zero to ten

11   pounds frequently with that designation?

12       A.    Yes.

13       Q.    Next section is 11 to 20.  And it has -- Let me

14   just go through it, 11 to 20, 21 to 50, 50 to 100, and

15   over 100 state:  Never.  Is that correct?

16       A.    That's correct.

17       Q.    The next section is -- I think it's Pull force.

18   Do you know what pull force is?

19       A.    Something you're pulling.

20       Q.    And again we see that zero to ten says frequent

21   to use or manipulate hand tools, equipment and valves at

22   various heights.  Is that correct?

23       A.    Correct.

24       Q.    In your opinion, was Matt King in 2010 able --

25   able to use pull force zero to 10 frequently to use or

1    manipulate hand tools, equipment and valves at various

2    heights?

3         A.    Yes.

4         Q.    And then you'll see that for Pull force, 11

5    through 20, 21 through 50, 50 through 100, and over 100

6    state:  Never.  Is that correct?

7         A.    Correct.

8         Q.    Next we have Positional Demand.  Do you see

9    where it says that?

10        A.    Yes.

11        Q.    Okay.  The first section under Positional

12   Demand is -- activity is sitting.  And it's designated

13   as Frequent, sitting up to zero to two hours at a time,

14   up to two to four hours per day per shift.  Do you see

15   where it says that?

16        A.    Yes.

17        Q.    In your opinion in 2010, was Matt King able to

18   sit frequently for up to zero to two hours at a time two

19   to four hours per day?

20        A.    Yes.

21        Q.    And the next section under that is Standing.

22   In your opinion in 2010, was Matt King able to stand up

23   two to four hours at a time up to six to eight hours per

24   day?

25        A.    Yes.

1    Q.  Next section is Walking.  In your opinion in

2    2010, was Matt King able to walk frequently up to two to

3    four hours at a time, up to four to six hours per day?

4    A.  Yes.

5    Q.  Or per shift?

6    A.  Uh-huh.

7    Q.  Okay.

8    A.  Yes.

9    Q.  Next section is Balancing and it's again

10   Frequently.  In your opinion in 2010, was Matt King able

11   to balance frequently, which means maintaining his

12   balance while performing activities above ground level?

13   A.  Yes.

14   Q.  And then the next section is Climbing, which is

15   Often.  In your opinion in 2010, was Matt King able to

16   climb steps, vertical and inclined stairs and other

17   structures?

18   A.  Yes, so long as it's two to three flights of

19   stairs.

20   Q.  Okay.  Next section is Stooping.  And it is

21   also Occasional.  In your -- In your opinion in 2010,

22   was Matt King able to stoop while performing tasks?

23   A.  Yes.

24   Q.  Next section is Crouching.  In your opinion in

25   2010, was Matt King able to crouch while performing

1    tasks?

2         A.    Yes.

3         Q.    The next section is Kneeling.  In your opinion

4    in 2010, was Matt King able to kneel while performing

5    tasks?

6         A.    Yes.

7         Q.    The next section is Crawling.  In your opinion

8    in 2010, was Matt King able to crawl to maneuver into

9    various places or positions?

10        A.    Yes.

11        Q.    The next section is Reaching.  In your opinion

12   in 2010, was Matt King able to reach into various

13   places?

14        A.    Yes.

15        Q.    Next section is Grasping.  In your opinion in

16   2010, was Matt King able to do repetitive grasping?

17        A.    Yes.

18        Q.    Next section is Repetitive hand tasks.  In your

19   opinion in 2010, was Matt King able to do repetitive

20   grasping and arm movements?

21        A.    Yes.

22        Q.    Okay.  Underneath that you'll see Environmental

23   Exposures.  Do you see that section?

24        A.    Yes.

25        Q.    Okay.  Under Noise you'll see Low to high

1    levels, Occasional to Frequent.  In your opinion, would

2    noise levels have any effect on Matthew King's condition

3    in 2010?

4        A.  Would any noise?  No.  I mean, I think he can

5    tolerate it.

6        Q.  All right.  Let's look at underneath there

7    where it says Weather conditions.  It states:  All

8    conditions to include rain, cold, humidity, excessive

9    heat.  And it states:  (Refer to heat index chart).  All

10   right.  Let's talk about that for a second.  Matt King

11   worked in Bayport which is essentially Houston weather,

12   correct?

13       A.  Uh-huh.  Yes.

14       Q.  How long has Matt King lived in Houston?  Do

15   you know?

16       A.  I don't know.

17       Q.  Do you know where he grew up?

18       A.  No, I don't know.

19       Q.  Did you ever talk to Matt King about his

20   ability to tolerate heat?

21       A.  I would think, if he's lived in Houston for

22   more than two or three years, he can tolerate the heat

23   to a certain degree.

24       Q.  Do you know if Matt King was a runner?

25       A.  I don't know that.

1    Q.   Uh-huh.  Do you know if other conditions such

2    as thyroid disease that have issues with temperature

3    control?

4    A.   Yes.

5              MS. BARKSDALE:  Objection, irrelevant.

6    Q.   So someone with thyroid disease might have

7    difficulty with excessive heat or excessive cold,

8    correct?

9    A.   Yes.

10             MS. BARKSDALE:  Objection, irrelevant.

11   Q.   Okay.  In your opinion in 2010, was Matt King

12   able to perform his job under all weather conditions

13   including rain, cold, humidity and excessive heat?

14   A.   I have to put a limit -- limit on excessive

15   heat.  I don't know how high he can go with the heat.  I

16   mean, I think there's got to be a limit.

17   Q.   Okay.  And would his limit be different than an

18   average person's limit for heat?

19   A.   I would -- I think, probably.  I think I

20   would -- I would avoid excessive heat for sure in a

21   dialysis patient.

22   Q.   Okay.  And what would you consider excessive

23   heat and -- and length of time as excessive heat --

24   A.   I would say --

25   Q.   Wait.  Hang on.  Let me finish.  -- to be

1    reasonable for a person with end stage renal disease on

2    dialysis?

3         A.   I think anything over a hundred degrees would,

4    I think, would be excessive.

5         Q.   So barring a hundred degree weather, in your

6    opinion, would Matt King be able to perform his job

7    under all conditions to -- including rain -- including

8    rain, cold, humidity and excessive heat --

9         A.   Yes.

10        Q.   -- with that condition?

11        A.   Right.  Yes.

12        Q.   What about in the next section, Odors, chemical

13   odors?  Would Matt King have -- be able to tolerate

14   chemical odors as a -- as a person without end stage

15   renal disease?

16        A.   Yes.

17        Q.   Airborne particles and vapors, Dust and steam

18   and chemical vapors, in your opinion in 2010, would Matt

19   King have been able to be around airborne particles and

20   vapors as they're defined the same as any person who did

21   not have end stage renal disease?

22        A.   Yes.

23        Q.   Work in high precarious places says Climbing

24   ladders, climbing into pipe racks and towers.  In your

25   opinion in 2010, was Matt able to climb ladders, climb

1    into pipe racks and climb into towers?

2        A.    Right.   With the -- the limits of two to three

3    flights of stairs.

4        Q.    The next section is Work in tight spaces.   It

5    says:   Tight places in work environment.   In your

6    opinion in 2010, was Mat King able to work in tight

7    places within a work environment?

8        A.    Yes.

9        Q.    Next section is Chemical products.   In your

10   opinion in 2010, was Matt King able to tolerate chemical

11   products the same as a person who did not have end stage

12   renal disease?

13       A.    Yes.

14       Q.    All right.   The next is Hot surfaces, Heat from

15   pipes and products.   In your opinion in 2010, was Matt

16   King able to be around hot surfaces which is heat from

17   pipes and products the same as a person without end

18   stage renal disease?

19       A.    Yes, with the limit of a hundred degrees.

20       Q.    Work around moving equipment is stated as Pumps

21   and other rotating equipment.   In your opinion in 2010,

22   was Matt King able to work around moving equipment

23   including pumps and other rotating equipment the same as

24   a person who did not have end stage renal disease?

25       A.    Yes.

1    Q.    Then you'll see the next section is Safety

2    Equipment Required.  It's Safety glasses with side

3    shields, Hearing protection, Hard hat, Chemical goggles,

4    Leather and chemical gloves as needed, ANSI approved

5    foot wear, Tyvek suite as needed, fire retardant

6    clothing, Safety Harness, Other PPE as required by OSHA

7    regulations per job assignment.  In your opinion in

8    2010, was Matt King able to wear the safety equipment

9    that was required?

10    A.    Yes.

11    Q.    Let's go back to our lifting restrictions that

12    we talked about.  And it was pointed out that the 30

13    pound lifting restriction that you gave was different

14    than the zero to 50 pounds, of 21 to 50 pounds that we

15    saw on these lifting weight demands.  Is that correct?

16    A.    That's correct.

17    Q.    Is that for both of his arms or only the arm

18    with the fistula?

19    A.    Only the arm with the fistula.

20    Q.    Okay.  So Matt King in his other arm can

21    lift -- lift 21 to 50 pounds; is that correct?

22    A.    That's correct.

23    Q.    And was he able to do so in 2010?

24    A.    Yes.

25    Q.    Okay.  All right.  I want to talk with you a

1    little bit about risks that we discussed here today for

2    persons with end stage renal disease.

3         A.   Yes.

4         Q.   And one of the risks that was discussed at

5    length is heart disease.

6         A.   Yes.

7         Q.   All right.  Was Matt King symptomatic or

8    asymptomatic for heart disease?

9         A.   Asymptomatic.

10        Q.   And -- And today as you see him, is he

11   symptomatic or asymptomatic for heart disease?

12        A.   Asymptomatic.

13        Q.   All right.  Is Matt King at any higher risk for

14   heart disease?

15        A.   Yes, he is.

16        Q.   Okay.  And why is he in that higher risk group?

17        A.   Because of diabetes, high blood pressure and

18   being on dialysis.

19        Q.   Okay.  Is his --

20        A.   And being a man, a male.

21        Q.   Okay.  And because Matt King has heart disease

22   but he's asymptomatic, would you send him back into a

23   work environment with the restrictions that we just

24   discussed if you thought he was at high risk for sudden

25   death?

1      A.    I --

2      Q.    Well, let me -- let me back up.  Let me back

3  up.

4      A.    Yeah.  I'm -- I'm not so sure he has heart

5  disease.

6      Q.    Did you -- Okay.  That's my next question.

7      A.    I think he's a high risk for heart disease.

8  But I'm not so sure he has it.

9      Q.    Okay.  And that was my next question.

10     A.    Yes.

11     Q.    Today as we sit here, has Matt King ever, to

12  your knowledge, been diagnosed with heart disease?

13     A.    No.

14     Q.    Let's talk about cognitive deficits.  Is Matt

15  King symptomatic or asymptomatic for cognitive deficits?

16     A.    Asymptomatic.

17     Q.    All right.  And while I can recognize that Matt

18  King, because he has end stage renal disease, might be

19  in a higher risk group for that --

20     A.    Uh-huh.

21     Q.    -- along the cognitive deficit variable, I

22  think you said we start at, you know, there's

23  Alzheimer's type cognitive defects down, you know, to

24  first that then we're kind of in the middle when we talk

25  about cognitive defect as it --

1      A.    Uh-huh.

2      Q.    -- relates to end stage renal disease --

3      A.    Right.

4      Q.    -- correct?

5      A.    Correct.

6      Q.    Okay.  So Matt King is asymptomatic.  Do you

7    occasionally test Matt's mental abilities when you see

8    him?

9      A.    Yes.

10     Q.    Okay.  What types of tests do you do when you

11   see him?

12     A.    Well, what I've done is, I -- I gave him

13   three-word recall.  I also gave him -- told him to spell

14   earth backwards are world backwards.  I also asked him

15   to do addition and subtractions.  I also told him to --

16   asked him to do zero sevens.  I also -- I think I also

17   told him to draw me a clock with a specific time.

18     Q.    Okay.  Has he been able to perform all of those

19   functions?

20     A.    Yeah.  He did fine.

21     Q.    Okay.  Before Matt King was given the

22   restrictions we see in Exhibit 49, do you believe he

23   should've been independently examined by a nephrologist?

24     A.    Yes.

25     Q.    Okay.  Why do you believe that?

Page 127

1           (Recess taken.)

2       Q.    Dr. Muniz, isn't it true that after Matt King

3   was fired from his position in 2010, that you received a

4   copy of the restrictions after he was fired?

5       A.    Yes.

6       Q.    That was the first time you had ever seen Dr.

7   Withers' restrictions?

8       A.    Yes.

9       Q.    I want to clarify another point.  Matt King can

10  climb two to three flights of stairs, take a break and

11  then he could potential climb two to three more flights,

12  correct?

13      A.    Correct.

14      Q.    Exhibit 17 which is the job description that we

15  went through --

16      A.    Uh-huh.

17      Q.    -- bit by bit -- Okay -- did Dr. Withers ever

18  offer you a copy of that job description when you were

19  in discussions with him?

20      A.    No.

21      Q.    Did Dr. Withers ever invite you to come to the

22  plant to walk the plant and see where Matt went and what

23  he did?

24      A.    No.

25           MS. MARTIN:  That's it.  Pass the witness.

Page 138

1       I declare under penalty of perjury that the

2    foregoing is true and correct.

3

4                          _____

5                          HENRY MUNIZ, M.D.

6

7

8       SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned

9    authority, by the witness, HENRY MUNIZ, M.D., on this

10    the _____ day of _____, 2013.

11

12                          _____

13                          NOTARY PUBLIC IN AND FOR

14                          THE STATE OF _____

15

16    My Commission Expires: _____

17

18

19

20

21

22

23

24

25

Page 139

1    STATE OF TEXAS

2    COUNTY OF HARRIS

3                  REPORTER'S CERTIFICATE

4           ORAL DEPOSITION OF HENRY MUNIZ, M.D.

5                   JANUARY 15, 2013

6         I, the undersigned Certified Shorthand Reporter in

7    and for the State of Texas, certify that the facts

8    stated in the foregoing pages are true and correct.

9         I further certify that I am neither attorney or

10   counsel for, related to, nor employed by any parties to

11   the action in which this testimony is taken and,

12   further, that I am not a relative or employee of any

13   counsel employed by the parties hereto or financially

14   interested in the action.

15        SUBSCRIBED AND SWORN TO under my hand and seal of

16   office on this the _____ day of _____,

17   2013.

18

19                        _C. Lee Parks_

20                        C. Lee Parks
                          Certified Shorthand Reporter
21                        Certificate No. 1235
                          Expiration:  12-31-2013
22                        Esquire Deposition Solutions
                          Firm Registration No. 03
23                        1001 McKinney Street
                          Suite 805
24                        Houston, Texas 77002
                          Telephone:  (713) 524-4600

25